## CLAY, AKA ALI *v.* UNITED STATES

No. 783.  Argued April 19, 1971—Decided June 28, 1971

*Chauncey Eskridge* argued the cause for petitioner. With him on the briefs were *Jack Greenberg, James M. Nabrit III, Jonathan Shapiro,* and *Elizabeth B. DuBois.*

*Solicitor General Griswold* argued the cause for the United States. With him on the brief were *Assistant Attorney General Wilson* and *Beatrice Rosenberg.*

PER CURIAM.

The petitioner was convicted for willful refusal to submit to induction into the Armed Forces. 62 Stat. 622, as amended, 50 U. S. C. App. § 462 (a) (1964 ed., Supp.

V). The judgment .of conviction was affirmed by the Court of Appeals for the Fifth Circuit.[1] We granted certiorari, 400 U. S. 990, to consider whether the induction notice was invalid because grounded upon·an erroneous denial of the petitioner's claim to be classified as a conscientious objector.

## I

The petitioner's application for classification as a conscientious objector was turned down by his local draft board, and he took an administrative appeal. The State Appeal Board tentatively classified him I–A (eligible for unrestricted military service) and referred his file' to the Department of Justice for an advisory recommendation, in accordance with then-applicable procedures. 50 U. S. C. App. § 456 (j)·(1964 ed., Supp. V). The FBI then conducted an "inquiry" as required by the statute, interviewing some 35 persons, including members of the petitioner's family and many of his friends, neighbors, and business and religious associates.

There followed a hearing on "the character and good faith of the [petitioner's]' objections" before a hearing officer appointed by the Department. The hearing officer, a retired judge of many years' experience,[2] heard testimony from the petitioner's mother and father, from one of his attorneys, from a minister of his religion, and from the petitioner himself. He also had the benefit of a full report from the FBI. On the basis of this record the hearing officer concluded that the registrant

---

[1] The original judgment of affirmance, 397 F. 2d 901, was set aside by this Court on a ground wholly unrelated to the issues now before us, sub nom. *Giordano* v. *United States,* 394 U. S. 310. Upon remand, the Court of Appeals again affirmed the conviction. 430 F. 2d 165.

[2] The hearing officer was Judge Lawrence Grauman, who had served on a Kentucky circuit court for some 25 years.

was sincere in his objection on religious grounds to participation in war in any form, and he recommended that the conscientious objector claim be sustained.[3]

Notwithstanding this recommendation, the Department of Justice wrote a letter to the Appeal Board, advising it that the petitioner's conscientious objector claim should be denied. Upon receipt of this letter of advice, the Board denied the petitioner's claim without a statement of reasons. After various further proceedings which it is not necessary to recount here, the petitioner was ordered to report for induction. He refused to take the traditional step forward, and this prosecution and conviction followed.

## II

In order to qualify for classification as a conscientious objector, a registrant must satisfy three basic tests. He must show that he is conscientiously opposed to war in any form. *Gillette* v. *United States,* 401 U. S. 437. He must show that this opposition is based upon religious training and belief, as the term has been construed in our decisions. *United States* v. *Seeger,* 380 U. S. 163; *Welsh* v. *United States,* 398 U. S. 333. And he must show that this objection is sincere. *Witmer* v. *United States,* 348 U. S. 375. In applying these tests, the Selective Service System must be concerned with the registrant as an individual, not with its own interpretation of the dogma of the religious sect, if any, to which he may belong. *United States* v. *Seeger, supra; Gillette* v. *United States, supra; Williams* v. *United States,* 216 F. 2d 350, 352.

---

[3] Applicable regulations, 32 CFR § 1626.25 (1967 ed.), did not require that the hearing officer's report be transmitted to the Appeal Board, and the Government declined to disclose it to the petitioner. The statements in text are taken from the description of that report in the letter of advice from the Department of Justice, recommending denial of the petitioner's claim.

In asking us to affirm the judgment of conviction, the Government argues that there was a "basis in fact," cf. *Estep* v. *United States,* 327 U. S. 114, for holding that the petitioner is not opposed to "war in any form," but is only selectively opposed to certain wars. See *Gillette* v. *United States, supra.* Counsel for the petitioner, needless to say, takes the opposite position. The issue is one that need not be resolved in this case. For we have concluded that even if the Government's position on this question is correct, the conviction before us must still be set aside for another quite independent reason.

### III

The petitioner's criminal conviction stemmed from the Selective Service System's denial of his appeal seeking conscientious objector status. That denial, for which no reasons were ever given, was, as we have said, based on a recommendation of the Department of Justice, overruling its hearing officer and advising the Appeal Board that it "finds that the registrant's conscientious-objector claim is not sustained and recommends to your Board that he be not [so] classified." This finding was contained in a long letter of explanation, from which it is evident that Selective Service officials were led to believe that the Department had found that the petitioner had failed to satisfy each of the three basic tests for qualification as a conscientious objector.

As to the requirement that a registrant must be opposed to war in any form, the Department letter said that the petitioner's expressed beliefs "do not appear to preclude military service in any form, but rather are limited to military service in the Armed Forces of the United States. . . . These constitute only objections to certain types of war in certain circumstances, rather than a general scruple against participation in war in any form. However, only a general scruple against partici-

pation in war in any form can support an exemption as a conscientious objector under the Act. *United States* v. *Kauten,* 133 F. 2d 703."

As to the requirement that a registrant's opposition must be based upon religious training and belief, the Department letter said: "It seems clear that the teachings of the Nation of Islam preclude fighting for the United States not because of objections to participation in war in any form but rather because of political and racial objections to policies of the United States as interpreted by Elijah Muhammad. . . . It is therefore our conclusion that registrant's claimed objections to participation in war insofar as they are based upon the teachings of the Nation of Islam, rest on grounds which primarily are political and racial."

As to the requirement that a registrant's opposition to war must be sincere, that part of the letter began by stating that "the registrant has not consistently manifested his conscientious-objector claim. Such a course of overt manifestations is requisite to establishing a subjective state of mind and belief." There followed several paragraphs reciting the timing and circumstances of the petitioner's conscientious objector claim, and a concluding paragraph seeming to state a rule of law—that "a registrant has not shown overt manifestations sufficient to establish his subjective belief where, as here, his conscientious-objector claim was not asserted until military service became imminent. *Campbell* v. *United States,* 221 F. 2d 454. *United States* v. *Corliss,* 280 F. 2d 808, *cert. denied,* 364 U. S. 884."

In this Court the Government has now fully conceded that the petitioner's beliefs *are* based upon "religious training and belief," as defined in *United States* v. *Seeger, supra:* "There is no dispute that petitioner's professed beliefs were founded on basic tenets of the Muslim reli-

gion, as he understood them, and derived in substantial part from his devotion to Allah as the Supreme Being. Thus, under this Court's decision in *United States* v. *Seeger,* 380 U. S. 163, his claim unquestionably was within the 'religious training and belief' clause of the exemption provision." [4] This concession is clearly correct. For the record shows that the petitioner's beliefs are founded on tenets of the Muslim religion as he understands them. They are surely no less religiously based than those of the three registrants before this Court in *Seeger.* See also *Welsh* v. *United States,* 398 U. S. 333.

The Government in this Court has also made clear that it no longer questions the sincerity of the petitioner's beliefs.[5] This concession is also correct. The Department hearing officer—the only person at the administrative appeal level who carefully examined the petitioner and other witnesses in person and who had the benefit of the full FBI file—found "that the registrant is sincere in his objection." The Department of Justice was wrong in advising the Board in terms of a purported rule of law that it should disregard this finding simply because of the circumstances and timing of the petitioner's claim. See *Ehlert* v. *United States,* 402 U. S. 99, 103–104; *United States ex rel. Lehman* v. *Laird,* 430 F. 2d 96, 99; *United States* v. *Abbott,* 425 F. 2d 910, 915; *United States ex rel. Tobias* v. *Laird,* 413 F. 2d 936, 939–940; *Cohen* v. *Laird,* 315 F. Supp. 1265, 1277–1278.

Since the Appeal Board gave no reasons for its denial of the petitioner's claim, there is absolutely no way of knowing upon which of the three grounds offered in the Department's letter it relied. Yet the Government now acknowledges that two of those grounds were not valid.

---

[4] Brief for the United States 12.

[5] "We do not here seek to support the denial of petitioner's claim on the ground of insincerity . . . ." *Id.,* at 33.

And, the Government's concession aside, it is indisputably clear, for the reasons stated, that the Department was simply wrong as a matter of law in advising that the petitioner's beliefs were not religiously based and were not sincerely held.

This case, therefore, falls squarely within the four corners of this Court's decision in *Sicurella* v. *United States,* 348 U. S. 385. There as here the Court was asked to hold that an error in an advice letter prepared by the Department of Justice did not require reversal of a criminal conviction because there was a ground on which the Appeal Board might properly have denied a conscientious objector classification. This Court refused to consider the proffered alternative ground:

> "[W]e feel that this error of law by the Department, to which the Appeal Board might naturally look for guidance on such questions, must vitiate the entire proceedings at least where it is not clear that the Board relied on some legitimate ground. Here, where it is impossible to determine on exactly which grounds the Appeal Board decided, the integrity of the Selective Service System demands, at least, that the Government not recommend illegal grounds. There is an impressive body of lower court cases taking this position and we believe that they state the correct rule." *Id.,* at 392.

The doctrine thus articulated 16 years ago in *Sicurella* was hardly new. It was long ago established as essential to the administration of criminal justice. *Stromberg* v. *California,* 283 U. S. 359. In *Stromberg* the Court reversed a conviction for violation of a California statute containing three separate clauses, finding one of the three clauses constitutionally invalid. As Chief Justice Hughes put the matter, "[I]t is impossible to say under which clause of the statute the conviction was obtained." Thus, "if any of the clauses in question is invalid under the

Federal Constitution, the conviction cannot be upheld."
*Id.*, at 368.

The application of this doctrine in the area of Selective Service law goes back at least to 1945, and Judge Learned Hand's opinion for the Second Circuit in *United States v. Cain,* 149 F. 2d 338. It is a doctrine that has been consistently and repeatedly followed by the federal courts in dealing with the criminal sanctions of the selective service laws. See, *e. g., United States v. Lemmens,* 430 F. 2d 619, 623–624 (CA7 1970); *United States v. Broyles,* 423 F. 2d 1299, 1303–1304 (CA4 1970); *United States v. Haughton,* 413 F. 2d 736 (CA9 1969); *United States v. Jakobson,* 325 F. 2d 409, 416–417 (CA2 1963), aff'd *sub nom. United States v. Seeger,* 380 U. S. 163; *Kretchet v. United States,* 284 F. 2d 561, 565–566 (CA9 1960); *Ypparila v. United States,* 219 F. 2d 465, 469 (CA10 1954); *United States v. Englander,* 271 F. Supp. 182 (SDNY 1967); *United States v. Erikson,* 149 F. Supp. 576, 578–579 (SDNY 1957). In every one of the above cases the defendant was acquitted or the conviction set aside under the *Sicurella* application of the *Stromberg* doctrine.

The long established rule of law embodied in these settled precedents thus clearly requires that the judgment before us be reversed.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring.

I would reverse this judgment of conviction and set the petitioner free.

In *Sicurella v. United States,* 348 U. S. 385,[1] the wars

---

[1] As to the Court's analysis of *Sicurella* v. *United States,* 348 U. S. 385, and its application of *Stromberg* v. *California,* 283 U. S. 359, little need be said. The Court is, of course, quite accurate if

that the applicant would fight were not "carnal" but those "in defense of Kingdom interests." *Id.*, at 389. Since it was impossible to determine on exactly which grounds the Appeal Board had based its decision, we reversed the decision sustaining the judgment of conviction. We said: "It is difficult for us to believe that the Congress had in mind this type of activity when it said the thrust of conscientious objection must go to 'participation in war in any form.' ". *Id.*, at 390.

In the present case there is no line between "carnal" war and "spiritual" or symbolic wars. Those who know the history of the Mediterranean littoral know that the *jihad* of the Moslem was a bloody war.

This case is very close in its essentials to *Negre* v. *Larsen*, 401 U. S. 437, decided March 8, 1971. The church to which that registrant belonged favored "just" wars and provided guidelines to define them. The church did not oppose the war in Vietnam but the registrant refused to comply with an order to go to Vietnam because participating in that conflict would violate his conscience. The Court refused to grant him relief as a conscientious objector, overruling his constitutional claim.

The case of Clay is somewhat different, though analogous. While there are some bits of evidence showing conscientious objection to the Vietnam conflict, the basic objection was based on the teachings of his religion. He testified that he was

"sincere in every bit of what the Holy Qur'an and

opposition to "war in any form" as explained in *Gillette* v. *United States,* and *Negre* v. *Larsen,* 401 U. S. 437, is the law. But in my view the ruling in *Gillette* and *Negre* was unconstitutional. Hence of the three possible grounds on which the Board denied conscientious objector status, none was vaild.

the teachings of the Honorable Elijah Muhammad tell us and it is that we are not to participate in wars on the side of nobody who—on the side of non-believers, and this is a Christian country and this is not a Muslim country, and the Government and the history and the facts shows that every move toward the Honorable Elijah Muhammad is made to distort and is made to ridicule him and is made to condemn him and the Government has admitted that the police of Los Angeles were wrong about attacking and killing our brothers and sisters and they were wrong in Newark, New Jersey, and they were wrong in Louisiana, and the outright, every day oppressors and enemies are the people as a whole, the whites of this nation. So, we are not, according to the Holy Qur'an, to even as much as aid in passing a cup of water to the—even a wounded. I mean, this is in the Holy Qur'an, and as I said earlier, this is not me talking to get the draft board—or to dodge nothing. This is there before I was borned and it will be there when I'm dead but we believe in not only that part of it, but all of it."

At another point he testified: "[T]he Holy Qur'an do teach us that we do not take part of—in any part of war unless declared by Allah himself, or unless it's an Islamic World War, or a Holy War, and it goes as far—the Holy Qur'an is talking still, and saying we are not to even as much as aid the infidels or the nonbelievers in Islam, even to as much as handing them a cup of water during battle."

"So, this is the teachings of the Holy Qur'an before I was born, and the Qur'an, we follow not only that part of it, but every part."

The Koran defines *jihad* as an injunction to the believers to war against nonbelievers: [2]

"O ye who believe! Shall I guide you to a gainful trade which will save you from painful punishment? Believe in Allah and His Apostle and carry on warfare (*jihad*) in the path of Allah with your possessions and your persons. That is better for you. If ye have knowledge, He will forgive your sins, and will place you in the Gardens beneath which the streams flow, and in fine houses in the Gardens of Eden: that is the great gain." M. Khadduri, War and Peace in the Law of Islam 55–56 (1955).

The Sale edition of the Koran, which first appeared in England in 1734, gives the following translation at 410–411 (9th ed. 1923):

"Thus God propoundeth unto men their examples. When ye encounter the unbelievers, strike off their heads, until ye have made a great slaughter among them; and bind them in bonds; and either give them a free dismission afterwards, or exact a ransom; until the war shall have laid down its arms. This shall ye do. Verily if God pleased he could take vengeance on them, without your assistance; but he commandeth you to fight his battles, that he may prove the one of you by the other. And as to those who fight in defence of God's true religion, God will not suffer their works to perish: he will guide them, and will dispose their heart aright; and

---

[2] Koran 61:10–13.

"War, then, is here an integral part of the legal system; for in accordance with the doctrine of the *jihad*, which is recognized as 'the peak of religion,' the Islamic commonwealth must be expanding relentlessly, like a caravan continuously on the move, until it becomes coterminous with humanity, at which time war will have been transposed into universal peace." A. Bozeman, The Future of Law in a Multicultural World 81–82 (1971).

he will lead them into paradise, of which he hath told them. O true believers, if ye assist God, by fighting for his religion, he will assist you against your enemies; and will set your feet fast. . . ."

War is not the exclusive type of *jihad;* there is action by the believer's heart, by his tongue, by his hands, as well as by the sword. War and Peace in the Law of Islam 56. As respects the military aspects it is written:

"The *jihad,* in other words, is a sanction against polytheism and must be suffered by all non-Muslims who reject Islam, or, in the case of the dhimmis (Scripturaries), refuse to pay the poll tax. The *jihad,* therefore, may be defined as the litigation between Islam and polytheism; it is also a form of punishment to be inflicted upon Islam's enemies and the renegades from the faith. Thus in Islam, as in Western Christendom, the *jihad* is the *bellum justum." Id.,* at 59.

The *jihad* is the Moslem's counterpart of the "just" war as it has been known in the West.[3] Neither Clay nor Negre should be subject to punishment because he will not renounce the "truth" of the teaching of his respective church that wars indeed may exist which are just wars in which a Moslem or Catholic has a respective duty to participate.

What Clay's testimony adds up to is that he believes only in war as sanctioned by the Koran, that is to say, a religious war against nonbelievers. All other wars are unjust.

That is a matter of belief, of conscience, of religious principle. Both Clay and Negre were "by reason of reli-

---

[3] The last attempt to use the *jihad* as a significant force was made in 1914 by the Ottoman sultan; but it failed and the *jihad* has fallen into disuse. See 1 A. Toynbee, Survey of International Affairs, 1925, p. 43 *et seq.* (1927); 8 Encyclopaedia of the Social Sciences 401–403 (1932).

gious training and belief". conscientiously opposed to participation in war of the character proscribed by their respective religions. That belief is a matter of conscience protected by the First Amendment which Congress has no power to qualify or dilute as it did in § 6 (j) of the Military Selective Service Act of 1967, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. V) when it restricted the exemption to those "conscientiously opposed to participation in war in any form." For the reasons I stated in *Negre* and in *Gillette* v. *United States*, 401 U. S. 437, 463 and 470, that construction puts Clay in a class honored by the First Amendment, even though those schooled in a different conception of "just" wars may find it quite irrational.

I would reverse the judgment below.

Mr. Justice Harlan, concurring in the result.

I concur in the result on the following ground. The Department of Justice advice letter was at least susceptible of the reading that petitioner's proof of sincerity was insufficient as a matter of law because his conscientious objector claim had not been timely asserted. This would have been erroneous advice had the Department's letter been so read. Since the Appeals Board might have acted on such an interpretation of the letter, reversal is required under *Sicurella* v. *United States*, 348 U. S. 385 (1955).