**UNITED STATES of America, Plaintiff,**

v.

**Richard Joseph ZIOBRO, Defendant.**

**Crim. No. 5-1590-C.**

United States District Court, S. D. Iowa, Central Division.

Feb. 16, 1972.

---

Allen L. Donielson, U. S. Atty., Richard J. Barry, Asst. U. S. Atty., Des Moines, Iowa, for plaintiff.

Philip J. Mause, Iowa City, Iowa, for defendant.

MEMORANDUM AND ORDER

HANSON, Chief Judge.

An Indictment was returned by the United States Grand Jury for the Southern District of Iowa on May 20, 1971, against the defendant, Richard Joseph

Ziobro, charging him with wilful and knowing failure and refusal to submit to induction into the Armed Forces of the United States in violation of Title 50 Appendix, Section 462 of the United States Code. On July 13, 1971, defendant filed a Motion to Dismiss the Indictment, attacking the legality of the induction order. This ruling is predicated upon the Motion to Dismiss.

The matter was heard on September 29, 1971, at which time the Government introduced a certified copy of defendant's Selective Service System file into evidence. The file reveals the following facts:

Defendant Ziobro registered with Local Board No. 12 for New Jersey on October 12, 1964, subsequent to his eighteenth birthday. At all times prior to July 16, 1968, he was classified II–S because he was a full-time college student. On July 16, 1968, the local board voted to reclassify Ziobro I–A. On August 12, 1968, Ziobro gave notice of appeal and requested a meeting with the Government appeal agent. The appeal was based upon his entry into graduate school. On October 23, 1968, Appeal Board Panel No. 2 for the State of New Jersey voted 5–0 to classify Ziobro I–A.

On March 19, 1969, Ziobro was found physically and mentally acceptable for induction. On May 16, 1969, the local board sent Ziobro an order to report for induction on June 2, 1969.

On May 21, 1969, the local board received a letter from Ziobro stating that he was a conscientious objector and requesting SSS Form 150, the C.O. form. On May 26, 1969, the local board postponed Ziobro's induction until the July call. The local board received Ziobro's completed Form 150 on June 26, 1969. Ziobro signed statement I(B) of Form 150 which is a request for status I–O. His statements in support of his claim are set out in the margin.[1]

1. I believe that war is a method of solving man's problems and that it is antithetical to the human race. War negates life itself. I am a Roman Catholic, and as a member of the Church I have learned to examine human behavior objectively to logically determine the best course of action that will result in favorable results for the greatest possible number. I believe that participation in war represents a direct negation of this training. War represents the elimination of a problem by causing the death of the people who come by, create, or have a problem. My belief in a Supreme Being and his wish that man multiply and rule the earth is directly negated by any attempt, direct or indirect, to destroy my own species as a shortcut to this directive.

I am a Roman Catholic. My parents are Roman Catholic. I attended Saint Valentines Roman Catholic grade school and was an altar boy for five years. Later I attended Essex Catholic High in Newark. At Essex Catholic, the Christian Brothers of Ireland stressed rationalism, objectivity, and personal commitment. They attempted to cultivate minds that could tackle any subject, not merely learn the styles of others. Teachers like Bro. John C. Martin, a former Columbia Broadcasting System vice-president and millionaire, and Bro. Arthur A. Loftus, now head of the North American Mission, inspired in me a respect for close examination and commitment to its results.

This experience, then, became the source of my motivation for later life. I realized what it meant to be religious. Bro. Martin, although a very successful executive, found little relationship between the service he performed and the money he received. In short, he was playing a game for profit and security. This led him to renounce his position and join the Christain Brothers of Ireland. It impressed me deeply to experience a man who had given up so much for a search in spiritual truths. After two years of classes and private conversations with Brother Martin I became convinced that his search was very valuable. It became obvious to me that only a life that fiercely examined the world in terms of ultimate concerns could feel ultimately rewarded. Neither personal gain, nor security could shrink me from a commitment to what I saw.

I became motivated by a moral concern to widen my vision beyond personal perspectives and create a sense of critical judgment superior to my native ability. Only in this way could I feel satisfied with

my life. I realized that this religious connection to truth, commitment and service went beyond particular church dogma or merely personal influences. I realized that my life was to be guided by a constant moral and ethical definition, and that, in many ways I could be called a secular minister, for my life would be focused and applied in terms of a moral committment to broaden more meaningful truths and the discovery of same.

I deliberately attended a college outside my faith in an attempt to expand my vision.

At Susquehanna University I became aware of great inadequacies in the American educational system of which I was now a very real part. General issues, such as compulsory religious services and *in loco parentis* were accute facets of the larger educational problem that were characterized at Susquehanna.

Several students and myself realized that there was no way out of these problems either for ourselves or others unless there was a deep examination of the problems followed by corrective measures. I deemed myself morally responsible to discover such answers. Along with ten other students I carefully researched the problems of Susquehanna and other colleges. After several months we presented a fourteen page white-paper to the students, faculty, administration and board of directors. This catalyst was so conclusive to crystallizing the campus problems that within a year of its publication major reforms were made at the University. The President of the American Association of University Professors, when presented with our white-paper and its related incidents, told Joseph L. Carter Jr., then Instructor of English at S. U., that this was perhaps the most intelligent, most constructive student "protest" in the history of the organization.

I therefore had tangible proof that diligence, thoroughness and moral conviction paid off—not only to my benefit, but to the lives of other students.

During my junior year I became deeply troubled by the race issue. I realized that discrimination and prejudice were vices that hampered meaningful personal and spiritual interchanges between human beings. In an effort to correct the error of discrimination several students, Professor Twombly, and myself created the "Instant Negro" a 100% cheap and effective temporary cosmetic treatment by which any white could successfully masquerade as a Negro. I picked a town near the University that was particularly imbeded with prejudice, Freeburg, Pa. "Dressed" as a Negro I tried to seek employment, place a mythical child in kindergarten, find an apartment and attend the local Sunday Lutheran Church service. I was successful only at the last venture. Other white students tried the same procedures from the same sources in Freeburg. They were very successful on all counts. My life was threatened on several occasions. If I did not leave town, it was made rather obvious that I would have a tough time.

After attending church services, I confronted the local Lutheran Minister, Larry McConnell as a white. I presented a picture of myself as a Negro and he admitted to having seen this man in church. I told him that I was that Negro. Paster McConnell invited me back to talk to the church council, a board of about fifteen influential businessmen in town, all of whom had seen me, and discriminated against me. When confronted with the evidence they were dumfounded. They were ready to change their opinions however, because I had not duped them. I had merely made them aware of a race they did not recognize as their own. Because I had been so honest and frank with them they felt no shame at instantly changing their minds. They admitted that each man must be treated as an individual and not stereotyped. They could change their minds, they frankly admitted, because I had searched for the truth, and not for an expose of their sins. Moral convictions and common sense had provided me with an effective non-violent program for the conversion of worthwhile people. I realized then that moral conviction was now at the heart of my life.

Soon after graduation I faced either graduate school or the army. In June 1968 I visited Sgt. Cross of the U.S. Army in Mountclair and inquired about enlisting. I also consulted Sgt. Bumbrey of the Air Force. I decided to make application for Air Force Pilot Training, a five year committment. I successfully passed all the physical and mental tests, as Sgt. Bumbrey later stated, "with flying colors". However I was rejected in October 1968 because of the over availability of similarly qualified candidates. During this waiting period I decided to attend Graduate School to determine if I were suited for it. By the time I was rejected for Air Force Pilot Training I realized that Graduate School was indeed for me. In contact with other graduate students I began to

On June 26, 1969, the local board received a number of items from Ziobro. Two of the items were letters regarding his nonselection to Air Force Officer Training School. The other seven items were letters in support of his C.O. claim. Four letters were from college professors; one from a former employer; one from a life-long friend; and, one from Ziobro's pastor. The letters all attest to Ziobro's honesty and integrity. They further contain many recollections of the writers about Ziobro's thoughtful and humanistic concern for human problems and his non-violent approach toward their solution. The writers addressing themselves to the subject agree that the slow maturation of Ziobro's feelings against war was consistent with the deliberateness Ziobro evidenced in making other moral decisions. The local board also received Ziobro's application to volunteer for civilian work in lieu of induction into the Armed Forces.

On September 8, 1969, the local board wrote to Ziobro requesting that he appear for an interview at its meeting of September 23. An item appears in Ziobro's file dated September 23, 1969. It is unsigned, but contains the initials

question U.S. involvement in Viet Nam. I soon became aware of facts and circumstances that cast grave doubts about our handling of the war. I had considered war to be a necessary evil. The knowledge of hundreds of dead Americans with little or no tangible results convinced me of the inappropriate application of war to this situation. This belief matured with the reception of my induction notice. I realized that I was opposed to war, in any form, on the basis of my religious beliefs. I realized that the Army did not intend to make war obsolete and that my induction did not serve that cause. Rather, it would serve to continue to wage war through my tacit submission to the reasoning and methodology of the Army. With the reception of my induction notice I realized that I was thrown into a situation. I would have to reject my nonviolent, reasoned approach to life and perform crimes of injustice, violence, and submission to an authority from which I would have no recourse. I realized that never before in my life had I been under such an authority. My induction notice made it clear to me that I would have to throw away all my education, training, and beliefs in order to serve a dubious cause by a method (violence) that I realize now is antithetical to life itself. I realized that any support or participation by myself would be moral deception. My beliefs against war in any form, then, matured with the reception of my induction notice. The induction notice focused my attention and non-violent personality into direct confrontation with participation in war.

With my induction notice I realized that I would have to refuse induction into the Armed Forces at any cost—prison, loss of public integrity, etc., to preserve the essence of my manhood, the developed ability to reason and understand moral consequences of human action.

Because my beliefs as a Conscientious Objector have matured after my induction notice, I have only had the opportunity to voice my opinions to my family and close friends, some of whom are given as references in Series III of this form. In addition, I have informed my graduate advisor, Mr. David Chamberlain of my belief as a Conscientious Objector.

With regard to non-violence, however, I have given expression on many occasions. I have given oral expression of my belief in non-violence before virtually all members of the Susquehanna University community. I have had the opportunity of being interviewed on the campus radio station regarding my nonviolent treatment of the racial discrimination project in Freeburg, Pennsylvania. I have also given oral expression to non-violence in several public and private committees, discussion groups, and panel discussions whose subject was the problems facing Susquehanna University, both financially and academically.

I believe any type of active or reserve duty in the Armed Forces, whether combatant or noncombatant is an indirect aid and a direct witness of mutual beliefs with the Armed Forces. The Armed Forces do not merely stand for preparedness or self-defense, but rather, prescribes a certain method for dealing with aggression. That method is violence. Violence is a short-cut that undermines the human species. It destroys man's most precious resources, himself. Therefore, I could not identify myself, in any capacity, with an institution whose basic premise and methodology is violence, death and destruction. Mere association in any capacity would bastardize my beliefs and give aid and comfort to the Armed Forces as an institution.

"MCT"; the Court will assume that it was prepared by Marie C. Tyms, the executive secretary of the local board. It reads as follows:

Re: RICHARD J. ZIOBRO
SSN 28-12-46-901

Above registrant had informal interview with the Board in reference to his C.O. claim.

In answer to questions put to him by the Board registrant said he determined his belief as a conscientious objector when he received his induction notice. Prior to that time he had not faced the question of war squarely. With the reception of his notice he realized he could not submit to induction. Registrant said he believed he would have accepted a commission in the Air Force if same had been granted when he requested it in 1968. Registrant said "This appeal has already cost me a considerable amount of money." When the Board asked him how he said "It cost me money to contact the people to write these letters, about $300.00." Board asked him "how did it cost you expense to have these letters written." Registrant said "Telephone calls to explain in detail exactly what was required in these letters." The opinion of the Board "We have considered fully the documentation submitted by this young man and it appears that his convictions crystalized only after he had been rejected by the Air Force and upon receipt of his notice of induction. His demeanor did not evidence sincerity in his claim." Registrant is a graduate student. He is under postponed induction for consideration of this request. He was classified I-A.[2]

2. Defendant, in his affidavit to the Court, gives the following account of the interview:

On September 23, 1969, I arrived at Local Board #12 for New Jersey at approximately 7:30 p. m. I was the first registrant to arrive and was asked to draw up a sign up sheet which I did. At roughly 8:00 p. m. there were about a dozen registrants waiting for interviews.

Mrs. Tyms, the local board clerk, called for a registrant not on the list, who also was not present. I was then asked to enter the board meeting room.

There were five board members present and Mrs. Tyms. An elderly gentleman asked almost all the questions put to me (except where noted). To the best of my recollection, the following constitutes an accurate statement of the dialogue between me and the local board members.

BOARD—Mr. Ziobro, we have read your file including the letter from Mates Financial Services, and we are particularly interested in hearing how you prevented a student riot.

ANSWER—Well, it was a complex set of incidents—the campus had become quite unsettled for a period of time—then came Easter vacation. During the vacation, a potential benefactor was going to visit the college so the President felt that he should remove all "dirty" pictures from both men's and women's dorms. The President felt that the benefactor might become offended. The President issued an order to the maintenance crew to remove all objectionable, and I quote the word objectionable, material from the walls of the dorms. Unfortunately, the maintenance department used absolutely no discretion and took virtually everything—beer signs, posters, paintings, playboy pin-ups and even some high-priced works of art. The maintenance crew stuffed everything into garbage cans and piled the cans in front of the incinerators. When the students returned, most were angry and several were furious. One girl claimed that two framed pencil sketches were Picasso's and worth well over $1,000. This incident sort of touched off the student body who up to this time had mixed emotions as to how the administration was handling them. There had been a strict dress code issued, some temporary dismissals for minor drinking violations and it was reported by the newspaper staff that they were being told what to print.

Several students demonstrated against the dorm incident the first day after the vacation. This prompted the president to address the student body the next day. He angered the entire student body by first explaining about the benefactor and the maintenance department misunderstanding him. Most people than walked out of chapel, including a good number of faculty, when he said he would do it again if he pleased.

The feelings were running quite high—numerous football players who were good

The local board did not indicate to Ziobro the reason for denying his C.O. claim. SSS Form 217, dated September 23, 1969, indicates that the local board reopened Ziobro's classification and then reclassified him I–A. A local form, Form NJ–SS–48–78(a), dated September 24, 1969, indicates that the local board took action under 32 C.F.R., Sections 1625.2 & .3. It states:

CASE RE-OPENED. Class I–A. Mail SSS Form 110. Mail SSS Form 111, when applicable, and cancel any outstanding order to report for induction.

friends seriously discussed stoning and ransacking the administration building. I think they got the idea from a junior college somewhere in the state that had had its administration building overrun by the students and all the files destroyed. Also, several faculty members discussed quitting or refusing to hand in grades until the President came around.

Hearing all this, I got together with the President because I had been meeting with him over the past months about student affairs. He agreed to let me form a committee to meet with the administration and the board of directors about the grievances. That evening there was a rally that was rumored to be the starting point for the student sacking of the administration building. I got up and spoke. I told the students about the strong possibility that we could impress the administration—and especially the board of directors—to whom the students had never had access, with our position. After some chanting and parading the crowd broke up.

Later, we did meet with the administration and the board and were granted some concessions that even pleased most of the faculty. The students were reimbursed for their lost articles by the way.

BOARD—You are a graduate student currently enrolled at the University of Iowa?
ANSWER—Yes I am.
BOARD—Mr. Ziobro, you are aware that we cannot give you a deferment for graduate school.
ANSWER—Yes, I am well aware of that.
BOARD—(another board member, middle-aged male) What's he going for?
BOARD—A C.O.
BOARD—Mr. Ziobro, do you believe you would have entered the Air Force if you had received the offer?
ANSWER—At the time I believe I would have.
BOARD—At what time did you think you were a conscientious objector?
ANSWER—Well, as I've said in form 150, I don't think I made up my mind until I received the induction order. With its reception I realized that I was opposed to all war and I could not serve in the military. Up to that time, I guess I just did not address myself to the issue squarely.

BOARD—Would you consider 1–A–O?
ANSWER—No—as I said in form 150, I could not bend my conscience to serve in any organization whose main purpose was death and destruction—no matter what capacity.
BOARD—Do you have anything else for our consideration?
ANSWER—I have a copy of the white paper which I contributed to and helped edit.
BOARD—Will you please sign the sections you authored and show what you are responsible for in the paper.
ANSWER—Yes (at which point I claimed part editorship of lead statement and authorship to "Authentic Christian Existence".
BOARD—Do you have anything else you want us to consider?
ANSWER—No, I don't have anything else now. I haven't had a lot of time to get this together and this has already cost me quite a bit of money.
BOARD—(member who asked "What's he going for?")—How much?
ANSWER—About $300.
BOARD—What for?
ANSWER—Plane fare here today costs over $150 and I had to telephone most of the references as they are spread out all over the country now. I had to explain to some of them in detail why I required letters from them to my draft board.
BOARD—When did you fly in?
ANSWER—The 22nd.
BOARD—(member who asked "What's he going for?")—You are flying back?
ANSWER—Yes, Wednesday afternoon.
BOARD—Thank you Mr. Ziobro, we will consider your claim and let you know our findings soon.
ANSWER—Thank you.
To the best of my recollection, the meeting lasted for a length of time between ten and fifteen minutes.

The vote of the board is recorded as 6–0, and the form is signed by Clifford A. Reid, board member.

The local board received a letter from Ziobro on October 24, 1969, appealing his I–A classification. New Jersey Appeal Board Panel No. 2 voted 3–0 to place Ziobro in classification I–A on March 31, 1970. The appeal board gave no reason for its decision.

Ziobro then received his second order to report for induction, dated April 29, 1970, from his local board. He was to report on May 19, 1970, at Montclair, New Jersey. To enable him to complete his spring semester of graduate school, the local board postponed Ziobro's induction until the June call.

In a letter dated May 15, 1970, to Mr. Philip J. Mause, Ziobro's legal counsel, New Jersey State SSS Director Joseph T. Avella advised that the local board indicated insincerity as its reason for denying Ziobro's claim to C.O. status. On June 1, 1970, the local board ordered Ziobro to report for induction on June 24, 1970. On June 22, 1970, the New Jersey State Director ordered Ziobro's induction postponed until further notice. On August 13, 1970, Ziobro was notified by his local board to report for induction on August 25, 1970 at Montclair, New Jersey. On August 20, 1970, Ziobro requested of Local Board No. 13–52 for Johnson County, Iowa, that he be allowed to report to it. On August 27, 1970, the transfer action was approved; and, on September 1, 1970, Local Board 13–52 ordered Ziobro to report for induction on September 16, 1970 at Iowa City, Iowa.

On September 14, 1970, Ziobro was advised in writing by counsel that it was counsel's opinion that the induction order was illegal. On September 15, 1970, Ziobro wrote the following letter to his local board:

Please include the letter of Philip J. Mause dated September 14, 1970 in my file. I am refusing induction upon his opinion that my induction is illegal and that further preinduction review is impossible. I deeply regret the necessity of refusing induction but I understand that refusal remains the only course of action I may pursue to obtain my conscientious objector status.

On September 16, 1970, Ziobro reported to the Armed Forces Examining and Entrance Station in Des Moines, Iowa; and, on September 17, 1970, refused to submit to induction after being found physically fit for service.

In his Motion to Dismiss Indictment, defendant contends, among other points raised, that there exists no basis in fact for denial of his C.O. claim. Because the Court agrees with this contention, it will discuss only this point raised by defendant.

I.

United States v. Whalen, 451 F. 2d 755 (8th Cir. 1971), interpreting Ehlert v. United States, 402 U.S. 99, 91 S. Ct. 1319, 28 L.Ed.2d 625 (1971), holds that in most cases a local board is without authority to reopen a registrant's classification when a claim to C.O. status is first filed subsequent to registrant's notice to report for induction. It would appear, then, that the instant fact situation would fall within the purview of *Whalen*. If this were the case there would be a basis in fact for the appeal board decision to classify Ziobro I–A, because the C.O. claim could not have been properly before it.

This, however, is not a case falling within the *Whalen* rule for two reasons. First, the local board indicated in a document dated September 24, 1969, that it cancelled the outstanding order for Ziobro to report for induction. Second, the local board could only postpone Ziobro's induction for 120 days before the induction order would become invalid. 32 C. F.R., Section 1632.2(a). United States v. Watson, 442 F.2d 1273 (8th Cir. 1971). Even if the local board had not cancelled the induction order on September 24, the order would have become invalid because of the lapse of 120 days. Thus, Ziobro's

C.O. claim was properly before the local and appeal boards and they were required by law to consider the information submitted in the claim.

## II.

In a criminal prosecution the District Court reviews the decision of the highest body within the Selective Service System that decided the issue—here, the appeal board. De Remer v. United States, 340 F.2d 712, 715 (8th Cir. 1965); United States v. Wymer, 284 F.Supp. 100 (S.D.Iowa 1968). The appeal board makes a *de novo* determination, 32 C.F.R., Section 1626.25. Thus, the Court must examine the record as it appeared before the appeal board.

The scope of this Court's review of Selective Service System determinations is set out in United States v. Watson, 442 F.2d 1273, 1277 (8th Cir. 1971):

Decisions of local boards are final even though erroneous if they are made in conformity with the regulations. It is not for the courts to sit as super draft boards substituting their judgment on the weight of the evidence for that of the designated agencies. The scope of review is narrow, permitting the reviewing court to overturn a draft classification only if it has no basis in fact or if the local board's action has the effect of denying appellant basic procedural fairness.

With this very narrow scope of review in mind, the Court turns to the substantive issue.

Subsection 456(j) of Title 50 Appendix of the United States Code reads in part as follows:

Nothing contained in this title [sections 451, 453, 454, 455, 456 and 458–471 of this Appendix] shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term "religious training and belief" does not include essentially political, sociological or philosophical views, or a merely personal moral code.

Clay v. United States, 403 U.S. 698, 700, 91 S.Ct. 2068, 2070, 29 L.Ed.2d 810 (1971), states that a registrant must prove the following elements to obtain classification as a conscientious objector:

In order to qualify for classification as a conscientious objector, a registrant must satisfy three basic tests. He must show that he is conscientiously opposed to war in any form. Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168. He must show that this opposition is based upon religious training and belief, as the term has been construed in our decisions. United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733; Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308. And he must show that this objection is sincere. Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428. In applying these tests, the Selective Service System must be concerned with the registrant as an individual, not with its own interpretation of the dogma of the religious sect, if any, to which he may belong. United States v. Seeger, supra; Gillette v. United States, supra; Williams v. United States, 216 F.2d 350, 352.

The Government concedes that Ziobro makes a *prima facie* claim for conscientious objector status. It contends, however, that the reason given by the local board in the document dated September 23, 1969, that Ziobro's "demeanor did not evidence sincerity in his claim" is sufficient to give a basis in fact for denying the C.O. claim.

The Eighth Circuit has stated in United States v. Abbott, 425 F.2d 910, 913–14 (8th Cir. 1970):

" . . . A local board may find that an applicant lacks sincerity in his

beliefs because his demeanor demonstrates a shiftiness or evasive attitude which would substantiate unreliability. Witmer v. United States, supra, 348 U.S. at 382, 75 S.Ct. 392, 99 L. Ed.2d 168. However, this cannot serve as a basis-in-fact for an appeal board to reject a conscientious objector claim unless there exists some disclosure of this finding of unreliability by the local board on the applicant's selective service record."

This reasoning was expanded further in the recent case of United States v. Iverson, 455 F.2d 79 (8th Cir., January 31, 1972):

We have further held that "mere *ipse dixit* disbelief [of the sincerity of the applicant] is not sufficient support for such a determination without affirmative evidence to measure contradiction." United States v. Abbott, 425 F.2d 910, 913 n.4 (8th Cir. 1970). Thus, it is necessary that some *affirmative* evidence indicating insincerity or bad faith be shown to rebut Iverson's claim to conscientious objector status. United States v. Owen, 415 F.2d 383, 389 (8th Cir. 1969). And such factors must be apparent from an examination of the file. United States v. Rutherford, 437 F.2d 182, 183 (8th Cir. 1971).

In Iverson's personal interview he was asked his opinion on campus violence. He replied "in a low voice" that he did not have an opinion one way or another since he was not involved. The trial court held that Iverson's cover sheet "discloses evidence of his insincerity, such as . . . his attitude and demeanor when appearing before his local board . . .". Commenting on this finding, the Court of Appeals for the Eighth Circuit said:

There is nothing in the file to indicate a poor attitude or demeanor except a notation by the Executive Secretary that he answered "in a low voice," which is not necessarily indicative of a poor attitude or demeanor.

*Iverson, supra,* at p. 82.

■ On the basis of *Witmer, Abbott,* and *Iverson* the Court holds that the bare assertion of insincerity based upon demeanor is not sufficient factual basis for denying conscientious objector status. If a local board is going to rely on subjective evidence of sincerity, such as appearance or demeanor, it must build an *affirmative* record of facts specifically demonstrating why the appearance or demeanor of the registrant is bad. The local board did not build such an affirmative record in this case.

■ There are only two other possible factors apparent from an examination of the file which might indicate insincerity or bad faith on the part of Ziobro. The first possible contradiction to his C.O. claim concerns his attempted enlistment in Air Force Officer Training School after graduation from college. This reason has been rejected specifically by the Eighth Circuit as grounds for denying a C.O. claim. Caverly v. United States, 429 F.2d 92, 95 (8th Cir. 1970). The second possible ground for questioning Ziobro's sincerity concerns his last minute assertion of his C.O. claim. Indeed, he did not assert it until after he had received his notice to report for induction in May of 1969. Before October 23, 1968, however, Ziobro was either classified II–S or was pursuing that classification before the Selective Service System. II–S, the classification for college students, is a lower classification than the I–O he is seeking today. Thus, it was only after October 23, 1968, that the I–O classification was relevant to Ziobro. Cases are legion in the Eighth Circuit in support of the proposition that "when a registrant makes application at the time his beliefs become 'relevant' to his classification, then lateness of the claim cannot affect the registrant's sincerity." *Iverson, supra;* United States v. Rutherford, 437 F.2d 182, 185 (8th Cir. 1971); *Abbott, supra,* 425 F.2d at 915; United States v. Cummins, 425 F.2d 646, 650 (8th Cir. 1970). In *Iverson,* the registrant claimed C.O. status over a year

after the classification became relevant to him. In the four cases cited, however, the C.O. claim was made before an induction order was sent out. There is some suggestion in *Iverson* that a claim made after an order for induction might indicate timing based upon expediency rather than upon a late crystallization of the registrant's views. If insincerity or bad faith can be imputed from the mere filing of a C.O. claim after an order for induction has been received, then it logically follows that any person claiming C.O. status after he is already in the service should always be found insincere or in bad faith, because this person is always motivated in part by a strong desire to get out of the service. This would be contrary to the implicit assumption in Ehlert v. United States, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971), and United States v. Whalen, 451 F.2d 755. (8th Cir. 1971), that a claim for conscientious objector status can ripen after a person is in the service. Countless federal courts have so held. Thus, this Court holds that the mere fact that Ziobro's C.O. claim ripened after he received his order to report for induction is not by itself a basis in fact for a finding of insincerity.[3]

None of the facts discussed above support a finding of insincerity when viewed separately. The Court finds no synergism occurring when all these facts are viewed together; together they are still not sufficient to provide a basis in fact for the appeal board's action. The Court, therefore, holds that the appeal board had no basis in fact for denying Richard Ziobro's claim for C.O. status.

Accordingly, it is ordered that the Motion to Dismiss Indictment of Richard Joseph Ziobro be and the same hereby is granted and sustained, without prejudice to new proceedings for defendant's induction by the Selective Service System.

---

3. The Court recognizes the influence that the letters from others in support of Ziobro's claim have had upon its decision. These letters make clear the deliberateness historically inherent in Ziobro's thought processes when making moral decisions. The Court, therefore, will limit its holding to this particular set of facts.