**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Christopher Joseph MUSSER,**
**Defendant-Appellant.**

**No. 72-1276.**

United States Court of Appeals,
Ninth Circuit.

May 2, 1973.

Francis A. Watson Jr. (argued), Ronald A. Rubenstein, Watson, Hoffe & Fannin, Richmond, Cal., for defendant-appellant.

Robert E. Carey, Jr., Asst. U. S. Atty. (argued), James L. Browning, U. S. Atty., F. Steele Langford, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before HUFSTEDLER and CHOY, Circuit Judges, and SMITH,* District Judge.

---

* The Honorable Russell E. Smith, Chief Judge of the United States District Court for the District of Montana, sitting by designation.

PER CURIAM:

Defendant appeals his conviction of refusing to submit to induction (50 U.S.C. App. § 462(a)). An induction order issued September 15, 1970, ordered defendant to report on October 14, 1970. On September 21, 1970, defendant requested and received the special form for conscientious objectors which he returned to the local board on September 28, 1970. The board reviewed the claim, determined that it lacked sincerity, refused to reclassify defendant,[1] and advised defendant that he must report for induction.

It is now claimed that the board did in fact consider the claim on the merits and in fact reopened the classification, and that having done so the board could not label its action as a refusal to reopen and thus cut off defendant's rights to appear, be heard, and appeal. Defendant relies upon Miller v. United States, 388 F.2d 973 (9th Cir. 1967).

■ ■ 32 C.F.R. § 1625.2 provides that a classification "shall not be reopened" after the induction order is mailed unless the board "first specifically finds there has been a change in the registrant's status resulting from circumstances over which the registrant had no control." The language is mandatory. The board lacks power to reopen in the absence of the required finding. United States v. Stupke, 451 F.2d 997 (9th Cir. 1971); United States v. Hand, 443 F.2d 826 (9th Cir. 1971). A local draft board lacking power to formally reopen cannot accomplish a de facto reopening. United States v. Nix, 437 F.2d 746 (9th Cir. 1971). Miller v. United States, *supra,* is not contrary. In that case the State Director, acting within his authority, had ordered the local board to reconsider.

■ Had Musser been inducted and had he made an in-service claim to conscientious objector status no presumption that the local board evaluated and denied that claim could have been drawn. The board was powerless to reopen the classification. Anything the board recorded in its minutes or did on the merits of Musser's conscientious objection had no validity, force, or effect.

Affirmed.

HUFSTEDLER, Circuit Judge (dissenting):

I recognize that a conflict in the circuits now exists on this question and that authorities in some of the circuits support the majority's view.[1] This conflict has been engendered by differing interpretations of the Supreme Court's decision in Ehlert v. United States (1971) 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625. I read *Ehlert,* as do the First and Third Circuits, as requiring that every conscientious objector applicant has meaningful opportunity for at least one full and fair administrative determination of his conscientious objector claim and that the registrant cannot be relegated to a " 'no man's land' " where his claim will never be administratively reviewed.[2] See United States

---

1. The local board's minutes stated: "C.O. claim reviewed under section 1625.2 SSR and classification not reopened." And the form letter notice to Musser said that his classification was not reopened because there had not been a change in status resulting from circumstances over which he had no control.

1. *See* United States v. Waldron (7th Cir. 1973) 474 F.2d 90; *cf.* Swift v. Director of Selective Service (D.C.Cir.1971) 145 U.S.App.D.C. 224, 448 F.2d 1147; Wright v. Ingold (7th Cir. 1971) 445 F.2d 109.

2. "That those whose views are late in crystallizing can be required to wait [to present their claims after induction], however, does not mean that they can be deprived of a full and fair opportunity to present the merits of their conscientious objector claims for consideration under the same substantive criteria that must guide the Selective Service System. See Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 . . . It would be wholly arbitrary to deny the late crystallizer a full opportunity to obtain a determination on the merits of his claim to exemption from combatant training and service just because his conscientious scruples took shape during a brief period in legal limbo.[7]
   "7. Since such a 'no man's land' would be intolerable our decision today simply involves settling in which

v. Alioto (1st Cir. 1972) 469 F.2d 722; United States v. Ziskowski (3rd Cir. 1972) 465 F.2d 480; United States v. Shomock (3rd Cir. 1972) 462 F.2d 338; see also United States v. Usdin (E.D. N.Y. Dec. 21, 1972) 6 SSLR 3039; United States v. Cotton (S.D.N.Y.1972) 346 F.Supp. 691; United States v. Takala (E.D.Mich. Sept. 11, 1972) 5 SSLR 3773.

Judge Coffin's opinion in *Alioto* eloquently expresses my own views on the correct interpretation of *Ehlert*. That reading would compel a reversal of this conviction for the *Ehlert* " 'no man's land' " script exactly fits Musser.[3] Under the pertinent Selective Service regulations and case law, the local board could not simultaneously make an evaluative determination that his claim lacked sincerity and not reopen his classification.[4] I am also convinced that the local board's contradictory and ambiguous characterizations of its actions could have foreclosed appellant from an in-service forum for his conscientious objector claim. See United States v. Usdin, *supra*. Finally, were I to search the record to find a basis-in-fact for the local board's finding of appellant's insincerity, I would be compelled to conclude that the board's determination is wholly insupportable.[5]

forum late crystallizers must have an opportunity for a ruling on the merits. Whether they may have such an opportunity at all cannot be open to question. . . . " 402 U.S. at 103–104, 91 S.Ct. at 1323.

3. Following a I-A classification by his local board on February 25, 1970, appellant was ordered on September 15, 1970, to report for induction into the armed forces on October 14, 1970. On September 21, 1970, he requested and received an SSS Form 150 for conscientious objectors. The board members reviewed his claim on September 29, 1970. A summary of that meeting by the board's executive secretary indicates that:

"The local board reviewed registrant's complete claim. It was their determination that the claim lacks sincerity. Registrant must report for induction."

The local board minutes for that date bear the following handwritten entry: "Complete claim reviewed. Claim lacks sincerity." In addition, a barely legible stamped entry states that the "c. o. claim reviewed under section 1625.2 SSR and classification not reopened." On the same day of its meeting, the local board notified appellant by form letter that it had not reopened his classification:

"This will acknowledge receipt of your communication relative to your selective service status. The information contained therein has been considered by this board and you are hereby advised it did not specifically find there has been a change in status resulting from circumstances over which you had no control. In its opinion, the reopening or reclassification of your case is therefore not warranted."

4. Under certain circumstances a local board's handling of a registrant's request for a reopening and reclassification can constitute a constructive or de facto reopening of his classification, despite the board's characterization of its action as a denial of the reopening request. *E. g.,* United States v. Foster (9th Cir. 1971) 439 F.2d 29; Miller v. United States (9th Cir. 1967) 388 F.2d 973. Since Musser presented a prima facie case for conscientious objector status (*see* note 5 *infra*), any determination whether he was actually a conscientious objector could be evaluatively decided only through the normal processes and provisions of the regulations for considering and ascertaining classifications. The board's own records clearly demonstrate that appellant's claim was thoroughly reviewed. Only after this complete investigation did the board conclude the claim lacked sincerity. If the board did reopen and reconsider Musser's request, he was denied the important procedural rights of a personal appearance and appeal conferred by 32 C.F.R. § 1625.13. Mulloy v. United States (1970) 398 U.S. 410, 417–418, 90 S.Ct. 1766, 26 L.Ed.2d 362. The order to report for induction was accordingly invalid, and Musser's conviction for refusing to submit should be reversed.

5. As the Supreme Court has most recently observed:

"In order to qualify for classification as a conscientious objector, a registrant must satisfy three basic tests. He must show that he is conscientiously opposed to war in any form. Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168. He must show that this opposition is based upon religious training and belief, as the term has been construed in our decisions. United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733; Welsh v. United

States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308. And he must show that this objection is sincere. Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428." Clay v. United States (1971) 403 U.S. 698, 700, 91 S.Ct. 2068, 2070, 29 L.Ed.2d 810; *see also* United States v. McKinley (9th Cir. 1971) 447 F.2d 962.

In his representations to the board, appellant manifested those deeply held scruples against killing customarily associated with conscientious objection. He signed Statement B of Series I of Special Form for Conscientious Objector (SSS Form 150):

"I am, by reason of my religious training and belief, conscientiously opposed to participation in war in any form and I am further conscientiously opposed to participation in noncombatant training and service in the Armed Forces. I, therefore, claim exemption from combatant and noncombatant training and service in the Armed Forces, but am prepared to perform civilian alternative service if called. Registrants granted this status are classified I-O."

Commenting on the source of religious training and belief that formed the basis of his claim, Musser indicated as follows:

"Parents & family strongly Roman Catholic. Catechism (Our Lady of Loretto Parish, Novato Ca.) until the age of 12 (weekly) Confirmed at 12 yrs. active member of C.Y.O. with close relationship with Parish Priests. Public school education (Novato) Close friend of family—Father Thomas Reilly; profound influence until College age. Member Newman Club, College of Marin. Influenced by the writings of Bertrand Russel [*sic*] of which I have read almost everything."

In his attached statement amplifying his views, Musser set out in great detail the underlying reasons for his convictions and the genesis of his beliefs:

"The nature of my belief in the sacredness of human life arises out of my religious training, and is a product of that training and the observations I have made concerning the relationship between people, and between people and their god.

"I believe in God in the Christian (Roman Catholic) sense—as an outward, affecting omnipresent being; and that Jesus Christ was the son of God, manifesting himself in human form for the purpose of communicating consciously with men on earth.

"However I also believe that God is within you ('The Kingdom of God is within you') and can only be truly understood by inward reflection on the knowledge that is attained in the world outside the body.

"It is this inward reflection that has brought me, spontaneously, to the realization that the spiritual life of the individual is primary; indeed it is the main purpose for living—and all else (on a purely religious level) in this life, is either meant to develop or retard the spiritual growth of men, depending on their capacity to recognize the truth and act upon it. ('For what does a man have if he should gain the whole world, but lose his own soul?')

"It is also this reflection (or belief), which I realize now would not allow me to participate in *any* war for the reason that I might be compelled, either by outside authority or animal instinct, to take the life of a person who by virtue of his wisdom could enrich my spiritual life considerably.

"These beliefs stem directly from my religious training. Questions 1 & 2, standard Catholic Catechism:

1. Who made us? Ans. God made us

2. Why did God make us? Ans. God made us to know, love and serve him that one day we might enter the kingdom of Heaven.

"In the end it is Jesus Christ who [*sic*] I believe we must look to, as Christians and as human beings, for an example to follow. Being a good Christian means being *as much in his image* as possible. Though it would be academic to argue whether Jesus would have let himself be drafted or not, the fact is that he never was. The fact is that when he was nailed to the cross, with all the power of the universe at his command, he only said 'Forgive them Lord, for they know not what they do.'

"These beliefs may appear to be the result of a process of thinking that could not have developed in the short time since I have received my notice of Induction. Actually, I never could have written this down for the purpose for which it is intended without receiving my notice. At that time the thoughts that had been brewing in my subconscious for so long were suddenly confronted with the reality that exists— that I could be called upon to kill another man for the beliefs that other people hold. I realize now that this is something I could not do."