No. 70–251. JOSEPH v. UNITED STATES. C. A. 3d Cir. [Certiorari granted, 404 U. S. 820.] After this Court granted the writ of certiorari in this case, the Solicitor General, in his Memorandum for the United States on the merits, took a position different from that previously asserted by the United States in the United States Court of Appeals for the Third Circuit and in his opposition to the petition for writ of certiorari. We therefore vacate the judgment and remand the case for consideration in light of the position now asserted by the Solicitor General.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE MARSHALL concurs, dissenting.

While I think the judgment should be vacated and the case remanded, I would not do so on the Solicitor General's confession of error, but rather for the reason that meaningful administrative and judicial review of Selective Service classification decisions is impossible where the Service does not state reasons for its actions.

Joseph, then classified I–A, applied for a conscientious objector exemption in April 1967. He stated in his conscientious objector form (SSS Form 150) that he believed in a Supreme Being, that he was a member of the Nation of Islam (Black Muslims), and that he had joined Muhammed's Mosque No. 12, in Philadelphia, in April 1965, at the age of 17. He represented the views of the Black Muslims regarding participation in war as follows:

> "We believe that we who declared ourselves to be Rightous [sic] Muslims Should not Participate in

wars which take the lives of humans. We do not believe this nation should force us to take part in such wars, for we have nothing to gain from it unless America agrees to give us the necessary territory wherein we may have something to fight for."

Joseph's board met on June 8, 1967. Based on the information in the SSS Form 150 and in the rest of Joseph's file, but without the benefit of a meeting with Joseph, the board voted unanimously to retain him in Class I–A, and sent him a notice of classification (SSS Form 110) to this effect. No reasons were given for the classification decision.

The Solicitor General argues from the premise that when the board acted, it effectively "reopened" Joseph's classification. According to the Solicitor General, the applicable regulations then in force prohibited a board from reopening a classification without first determining that a prima facie case had been made out. See 32 CFR §§ 1625.2, 1625.4. "[N]ot prepared to assume" that the board violated the reopening regulations, the Solicitor General reasons that the fact of reopening must therefore mean that the board had concluded (albeit erroneously) that Joseph had made out a prima facie case, and denied the claim because it questioned his sincerity.

The first difficulty with this argument is that a local board may well have the power to reopen a classification on a lesser showing than a prima facie case. See, *e. g.*, *United States* v. *Stephens*, 445 F. 2d 192, 196 (CA3 1971). Second, the Solicitor General's argument rests on the intent of the board. If the board did not think that it was reopening, there would have been no reason for it to worry about the prima facie case requirements allegedly contained in the reopening regulations. And the Solicitor General concedes that "some confusion" as to whether the June 8 action was a "reopening" developed at trial. Memorandum for the United States 18–19.

Assuming, however, that there was a reopening, the Solicitor General's argument still fails, for the board's subsequent handling of Joseph's claim rebuts any "presumption of regularity" that might otherwise be appropriate. Joseph's letter requesting an appeal from the June 8, 1967, decision was received by the board July 6, 1967. The request was thus timely under 32 CFR § 1626.2 (c)(1). No action was taken, however, until August 1, 1967, when Joseph was notified that his "statutory rights have expired," but that he was requested to appear August 10, 1967, for an interview. Joseph appeared as requested, and on August 14, 1967, the board forwarded his file to the appeal board. There is no indication in Joseph's file that the board took any action as a result of the August 10 "interview."

The above course of action embodied several violations of the Selective Service regulations. First, Joseph's statutory rights had not expired on August 1, 1967. His appeal was timely, and was required to be processed in accordance with 32 CFR § 1626.14, which stipulates that "in no event shall [a registrant's] file be forwarded [to the appeal board] later than five days after the period for taking an appeal has elapsed." The board violated this regulation by keeping Joseph's file past July 13, 1967.

Had Joseph requested a personal appearance in the letter written by him and received by the board on July 6, 1967, the board would have been authorized to retain his file. But he did not. The interview which the board granted him was a mere courtesy. As such, it was unauthorized by statute, *United States* v. *Hayden,* 445 F. 2d 1365, 1374 (CA9 1971), and could not operate to relieve the board of its statutory obligation to forward Joseph's file pursuant to the mandate of 32 CFR § 1626.14.

It can also be argued, from the fact that Joseph was

given an interview after the board received his letter on July 6, 1967, that the letter was deemed a request to reopen, as well as an appeal. There was testimony at Joseph's trial that the board's failure to indicate any action following the interview meant that it had refused to reopen Joseph's classification. (Testimony of Mr. Plaskow, App. 14.) But where a board refuses a registrant's written request to reopen his classification, it must so advise him, by letter, and it must place a copy of the letter in his file. 32 CFR § 1625.4. Joseph's board did not do so.

Whatever force the "presumption.of regularity" might have in the ordinary case, it is a weak reed on which to rest under these circumstances. But the "presumption" is the linchpin of the Solicitor General's analysis; without it, a number of alternate hypotheses become as plausible as if not more plausible than that offered by the Solicitor General.

For example, it was the Government's consistent position, until the Solicitor General's confession in *Clay* v. *United States*, 403 U. S. 698, that conscientious objector claims based on Black Muslim teachings did not satisfy the statutory requirement that they be based on "religious training and belief." The Justice Department letter quoted in *Clay, supra,* is representative of the Government's views at the time that Joseph's claim was under consideration:

> "It seems clear that the teachings of the Nation of Islam preclude fighting for the United States not because of objections to participation in war in any form but rather because of political and racial objections to policies of the United States as interpreted by Elijah Muhammad. . . . It is therefore our conclusion that registrant's claimed objections to participation in war insofar as they are based upon the teachings of the Nation of Islam, rest on

grounds which primarily are political and racial." 403 U. S., at 702.

If one is to decide this case by speculation and assumption, a likely analysis is that Joseph's local board knew of, and followed, the Justice Department's articulated policy with respect to Black Muslim conscientious objector claims. Joseph stated in his SSS Form 150, "I receive my training from the honorable Elijah Muhammad Last Messenger of Allah Leader and Teacher of the Nation of Islam here in The Wilderous [sic] of North America." Given the Government's oft-articulated views as to the insufficiency of such teachings to support a conscientious objector claim, Joseph's local board may well have denied his exemption for failure to demonstrate it was based on "religious training and belief." The Solicitor General concedes that such a ground would have been clear error. Memorandum for the United States 14 n. 13. See *Clay, supra,* at 703.

There is also the possibility that Joseph's board thought him to be a selective objector, because his statement of belief left open the possibility that he might fight if "America agrees to give us the necessary territory wherein we may have something to fight for." The Solicitor General strenuously insists that this is indeed the correct analysis of Joseph's claim.[1]

Finally, there is the difficulty inherent in accepting the Solicitor General's assumption that Joseph's claim was not denied for failure to meet any of the statutory criteria, but for insincerity. It is well settled that mere disbelief in the sincerity of a registrant, based on no objective evidence of insincerity, will not suffice to deny a con-

---

[1] Joseph argues persuasively, however, that this statement is nothing more than the Muslim equivalent of a Jehovah's Witness' declaration that he will fight in defense of "Kingdom Interests." *Sicurella* v. *United States,* 348 U. S. 385. See Brief for Petitioner 23–25.

scientious objector claim once a prima facie case is made out. *Dickinson* v. *United States,* 346 U. S. 389; *United States* v. *Hayden, supra,* at 1373. The "evidence of insincerity" pointed to by the Solicitor General is ambiguous at best. He notes that Joseph joined the Muslims a year before he first registered for the draft, and two years before filing for his conscientious objector exemption, but that he made no claim to conscientious objector status in his Classification Questionnaire, and no subsequent claim of late crystallization. By themselves, these facts seem insufficient. Joseph was a 17-year-old high school dropout when he became a Muslim. His lack of sophistication and minimal writing skills are apparent from his communications with the board. If we are to assume with the Solicitor General that Joseph's board found he made out a prima facie case, I should think it also follows that the board, having gone thus far, would make further inquiries into Joseph's sincerity rather than rely on such an ambiguous and inartful record.[2]

These speculations should not be taken to mean that I think the Solicitor General's analysis should be rejected. It is perhaps no less probable than the alternatives that I have suggested. The point is that it is no *more* probable.

---

[2] Other alleged indicia of insincerity need little comment. Many smokers would take issue with the Solicitor General's attempt to demean Joseph's statement that his ability to give up smoking was a demonstration of his faith. And, the statement by an unknown Army official that a psychological interview of petitioner revealed him to have "a mature attitude and interest in the Armed Forces" is simply meaningless without more information as to the nature of the interview in question and the particular responses on which the Army's conclusory remark was based. Moreover, the interview took place over five months before petitioner first filed his conscientious objector claim, and thus certainly cannot be taken as representing his views at the time his conscientious objector claim was denied.

Joseph's local and appeal boards might have denied his claim because he was thought to be insincere, because his Black Muslim beliefs were not thought to be religious, because he was thought to be a selective objector, or perhaps for some other reason not apparent from the record. Viewing this bare record from our perspective, there is simply no way to decide why it was that Joseph's claim was denied.[3]

The conviction must be reversed, therefore, not because Joseph made out a prima facie case and is thereby entitled to reasons, but because without a statement of reasons, it is impossible even to tell if Joseph's prima facie showing was a relevant factor in the administrative process.[4] I would require the Selective Service to pro-

---

[3] The "*de novo*" review undertaken by the appeal board suffers from this same deficiency. We do not know why the appeal board affirmed the lower board's action, for it, too, gave no reasons. And, the appeal board is just as much in the dark as we are with respect to the basis for the lower board's action. "The Appeal Boards are no more entitled to speculate as to the basis for Local Board action than are reviewing courts." *United States* v. *Speicher*, 439 F. 2d 104, 108 (CA3 1971). The appeal board, of course, should also be required to give reasons, for the proposition "[t]hat judicial review of two administrative agency actions unsupported by reasons is somehow less futile than judicial review of one such action," *id.*, at 107, is clearly untenable.

[4] This analysis is unchanged by the fact that the Administrative Procedure Act is not directly applicable to agency action under the Military Selective Service Act of 1967. See 50 U. S. C. App. § 463 (b). It remains a "simple but fundamental rule of administrative law . . . [that if] the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action." *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196–197.

Thus, in analyzing an NLRB decision dealing with the process of certifying labor representatives, a process expressly exempt from the formal procedural requirements of the Administrative Procedure Act, see 5 U. S. C. § 554 (a) (6), the Court squarely held that

vide a concise statement of reasons whenever a requested classification is denied, and whatever the administrative level at which the denial takes place.

---

the Board's determination could not stand unless supported by a statement of reasons:

"When the Board so exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 197. See *Burlington Truck Lines* v. *United States,* 371 U. S. 156, 167–169; *Interstate Commerce Comm'n* v. *J-T Transport Co.,* 368 U. S. 81, 93. Although Board counsel in his brief and argument before this Court has rationalized the different unit determinations in the variant factual situations of these cases on criteria other than a controlling effect being given to the extent of organization, the integrity of the administrative process requires that 'courts may not accept appellate counsel's *post hoc* rationalizations for agency action . . . .' *Burlington Truck Lines* v. *United States, supra,* at 168; see *Securities & Exchange Comm'n* v. *Chenery Corp.,* 332 U. S. 194, 196. For reviewing courts to substitute counsel's rationale or their discretion for that of the Board is incompatible with the orderly function of the process of judicial review. Such action would not vindicate, but would deprecate the administrative process for it would 'propel the court into the domain which Congress has set aside exclusively for the administrative agency.' *Securities & Exchange Comm'n* v. *Chenery Corp., supra,* at 196." *NLRB* v. *Metropolitan Ins. Co.,* 380 U. S. 438, 443–444 (footnote omitted).