Lt. Alvin A. ROSENFELD, M. D.

v.

Rear Admiral Richard E. RUMBLE, Commandant, First Naval District, et al.

Misc. Civ. No. 74-27-F.

United States District Court,
D. Massachusetts.

Dec. 10, 1974.

Mitchell Benjoya, Zisson & Benjoya, Boston, Mass., for petitioner.

Marshall Stein, Asst. U. S. Atty., Boston, Mass., for respondents.

## OPINION and ORDER

FREEDMAN, District Judge.

Respondents' substitute motion to dismiss is before the Court in response to a petition for a writ of habeas corpus which seeks an order of the Court compelling the respondents to discharge the petitioner from the United States Navy Reserve as a conscientious objector.

This matter was heard by a magistrate who made a recommendation arising from his findings of fact and conclusions of law. Nevertheless, in light of the recent Supreme Court ruling in Wingo v. Wedding, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (decided June 26, 1974), the Court is constrained to make its own findings with respect to the motion.

On November 4, 1974, the Court heard a brief oral argument from the respondents. Evidently, the petitioner was content to rest on the pleadings and the record, given the fact that the parties have agreed by stipulation that the record is complete and that the relevant portions of the record are pages 12–17 and page 35 of the transcript of a May 24, 1973 hearing before Naval Commander Ralph C. Copeland.

The petitioner, Dr. Alvin A. Rosenfeld, is a resident of Massachusetts who is licensed to practice medicine in this Commonwealth. He is currently a Lieutenant in the Medical Corps of the United States Naval Reserve, having enrolled in March of 1971 in the Armed Forces Physician's Appointment and Residency Program (hereinafter referred to as the "Berry Plan"). The Berry Plan is a non-compensating deferred entrance program for physicians who enter specialty residence training. Under the plan, Dr. Rosenfeld was held in a reserve status pending the completion of his residency in psychiatry after which he was to perform two years of active duty in the Navy beginning in the Summer of 1974.

On February 28, 1973, the petitioner, while a member of the Berry Plan, filed a lengthy application for discharge from the Navy on the grounds that he conscientiously objected to all war. Attached to the application were 21 letters attesting to the sincerity of the applicant.

On May 24, 1973, Dr. Rosenfeld appeared with counsel for a hearing before Cmdr. Ralph C. Copeland, Judge Advocate General's Corps, United States Naval Reserve, at the Navy Law Center, Headquarters, First Naval District, Boston, Massachusetts. At the hearing, the petitioner was questioned at great length about his beliefs pertaining to his application for conscientious objector status. As a result of the applicant's statements at the hearing, Cmdr. Copeland recommended that the application be denied because it was his opinion ". . . that the applicant ha[d] not sustained the burden of proving that he is opposed to participation in war in any form under all circumstances." Report of Hearing Officer regarding application for discharge from the Naval Reserve as a conscientious objector in the case of Lt. Alvin Rosenfeld, July 11, 1973, p. 3.

Since the Navy's refusal to grant the petitioner's application stems directly from certain statements made by Dr. Rosenfeld at the hearing, it would be useful at this juncture to quote some of the relevant portions of the transcript.

"Cmdr. Copeland: Well, let's assume that tomorrow a war breaks out in which Russia attacks—let's assume that Russia commences a policy of a

violent, forceful, external, geographical expansion which involves the use of arms. All right? And let's assume that in this policy of forceful expansion they embark upon a policy of extermination of all Jews. Would you bear arms against the aggressor?

"Dr. Rosenfeld: If Russian troops landed on the shores of San Francisco —I am an American and, if attacked and—by a clear, definite enemy where there is no choice and no question that another human being is threatening me, my family, I would then bear arms." (Transcript, p. 14)

. . . . . .

"Cmdr. Copeland: At some point, I take it from your answer, you would bear arms?

"Dr. Rosenfeld: If the physical shores of the country were attacked—if there were a clear, visible enemy—if my life and my family's lives were threatened." (Transcript, p. 15)

"Cmdr. Copeland: . . . You've indicated that at some point you would [bear arms]. And you indicated, if they [Russians] landed in San Francisco on the territorial soil of the United States, you would—I think your indication was that you would at that point consider . . . bearing arms. Now I'm asking you on what basis are you relying on this distinguishment of position based upon artificial national boundaries, where the policy remains the same and it could be geographically conceivably closer to your home and your family, even though it is not in the territorial soil of the United States?

"Dr. Rosenfeld: Well, I believe that I can only bear arms when myself or my family is physically put in danger; and I think that is at the territorial boundaries of my country." (Transcript, p. 16.)

. . . . . .

"Cmdr. Copeland: In the hypothetical I gave you, let's assume that the country being aggressed against is the United States of America. Based

upon your prior testimony, is it fair to say you would have no hesitation in participating in the armed services? In some capacity.

"Dr. Rosenfeld: Can you specify what you mean by 'the country being aggressed against is the United States'?

"Cmdr. Copeland: The other country is using the armed force.

"Dr. Rosenfeld: Does that mean the troops would be landing?

"Cmdr. Copeland: Yes.

"Dr. Rosenfeld: Yes, I would defend myself.

"Mr. Benjoya, attorney for the petitioner: Would you be in the military?

"Dr. Rosenfeld: No. But I would defend myself."

(Transcript, p. 35)

On August 31, 1973, the Commandant of the First Naval District, specifically referring to some of the petitioner's statements set out above, concurred in Cmdr. Copeland's conclusion that "Dr. Rosenfeld does not hold a sincere objection to participation in war in any form or to the bearing of arms." First Endorsement on Cmdr. Ralph C. Copeland by the Commandant, First Naval District, August 31, 1973, p. 2. He therefore endorsed the hearing officer's recommendation that the petitioner's application be denied.

The petitioner's application was then forwarded to the Chief of Naval Personnel who, on September 28, 1973, further concurred in the decision to deny conscientious objector status to the petitioner. After citing some portions of the transcript set out above, the reviewing officer stated:

"3. A class I-O conscientious objector is a person who by reason of conscientious objection sincerely objects to participation of any kind in war in any form. It is apparent from the record that you are conscientiously opposed to participation in the armed forces. Similarly, it is readily apparent that you are not

opposed to participation of any kind in war in any form, because you have stated that you would participate as a combatant in a defensive war against an armed aggressor." Decision of the Chief of Naval Personnel on the status of Lt. Alvin A. Rosenfeld in the U. S. Naval Reserve, Sept. 28, 1973, p. 2.

It is this last denial of the petitioner's application from the highest Naval appellate administrative office, that is the subject of this petition for a writ of habeas corpus.

■ Before getting to the issue before the Court, some mention must be made of the standard of review used in this type of case. In Bates v. Commander, First Coast Guard District, 413 F.2d 475 (1st Cir., 1969), the Court of Appeals stated: "On review of a selective service classification the sole question for the court is whether 'a basis in fact' exists for the classification given. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946). The scope of our review is no less restrictive in the case of those who claim conscientious objection after entering the military service. (Citations omitted.)" 413 F.2d at 477. *See,* Gillette v. United States, 401 U.S. 437, 442, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971).

Other courts have referred to this type of review as the "narrowest known to the law." Blalock v. United States, 247 F.2d 615, 619 (4th Cir., 1957). *See,* Cohen v. Laird, 315 F.Supp. 1265, 1271 (D.S.C., 1970), aff'd, 439 F.2d 866 (4th Cir., 1971). Thus, if there was any factual basis in the record which would support the decision of law made by the Naval authorities, this Court cannot disturb that decision. United States v. Daniel, 462 F.2d 349 (9th Cir., 1972). *See,* Silberberg v. Willis, 420 F.2d 662, 665 (1st Cir., 1970).

The Court finds that the Navy had not only a basis in fact, but a substantial basis, to find the following with respect to the petitioner's views on his participation in war:

(1) The petitioner would bear arms to defend himself and his family if the United States were invaded by a foreign aggressor.

(2) The petitioner's participation in such a war would be on an individual basis only and not as a member of the armed forces.

(3) Such individual action by the petitioner would not necessarily be in response to aggressive acts committed in the immediate vicinity of the petitioner's residence.

■ Congress has set forth, in 50 App. U.S.C. § 456(j), the standard whereby a person shall be adjudged to be a conscientious objector. This section provides:

"Nothing contained in this title . . . shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to *participation in war in any form.*" 50 App. U.S.C. § 456(j) (emphasis added).

The Supreme Court has interpreted this statute to require an applicant to satisfy a threefold test before he can be classified as a conscientious objector. "He must [first] show that he is conscientiously opposed to war in any form. (Citation omitted.) [Second,] [h]e must show that this opposition is based upon religious training and belief . . . [Finally,] . . . : he must show that this objection is sincere." Clay v. United States, 403 U.S. 698, 700, 91 S. Ct. 2068, 2070, 29 L.Ed.2d 810 (1971).

It is not contended that the petitioner does not satisfy parts two and three of the test stated in *Clay.* The sole question here is whether the Navy had a "basis in fact" to refuse conscientious objector status to the petitioner for failure to satisfy the first part of the Clay test. Put more specifically, is the petitioner "conscientiously opposed to war in any form" if he is willing, in the

event of an invasion of the United States by a foreign aggressor, to bear arms individually to protect himself and his family even though such an invasion is not in physical proximity to the petitioner's family residence?

The petitioner argues that his views fall within the purview of a long line of cases [1] beginning with Sicurella v. United States, 348 U.S. 385, 75 S.Ct. 403, 99 L.Ed. 436 (1955), which, he contends, support the proposition ". . . that one does not have to be a pacifist to be a conscientious objector, and that a belief in the use of force in self-defense and in defense of family, home, co-religionists, ministry or faith, will not act as a bar or disqualification to conscientious objector status." Memorandum in Support of Petition for the Issuance of a Writ of Habeas Corpus, p. 14. While these cases may indeed support this proposition, the petitioner's reliance on them is misplaced because his views are clearly at odds with every case in which an exemption was given to an applicant who expressed a willingness to perform acts in defense of self or others.

 "Willingness to use force in self-defense, in defense of home and family, or in defense against immediate acts of aggressive violence toward other persons in the community, has not been regarded as inconsistent with a claim of conscientious objection to war as such. *See,* e. g., United States v. Haughton, 413 F.2d 736, 740–742 (9th Cir., 1969); United States v. Carroll, 398 F.2d 651, 655 (3rd Cir., 1968)." Gillette v. United States, *supra,* 401 U.S. at 448, 91 S.Ct. at 835.[2] Yet it should be stressed that all of these defensive acts imply a sense of physical and personal immediacy. Cf., Gillette v. United States, *supra,* at 448, 91 S.Ct. 828. That immediacy must be tested by objective, rather than subjective, criteria. Thus, the petitioner's belief that he, as a resident of Massachusetts, would be acting in self-defense by bearing arms during an invasion of San Francisco by an armed aggressor is irrelevant to this Court's determination of his claim of self-defense. On the other hand, the objective fact that he would bear arms in such a situation is crucial to the rejection of his claim because such a fact is geographically incompatible with a claim of self-defense or defense of family, home, or community.

The petitioner's reliance on *Sicurella* and its progeny seems to be an effort to read into those cases a judicial expansion of the geographical limits of self-defense to include defensive acts performed to protect an extended group with which one is affiliated. Yet after a reading of these cases, it is apparent that such an expansion was not intended.

In *Sicurella,* the petitioner was a Jehovah's Witness who was willing to fight a theocratic war in ". . . defense of his ministry, his brethren and Kingdom interests . . ." 348 U.S. at 389, 75 S.Ct. at 405. His participation in this war would be expressly limited to the use of spiritual, rather than carnal, weapons.

In holding that the applicant was entitled to conscientious objector status, the Supreme Court, per Mr. Justice Clark, stated:

"As to theocratic war, petitioner's willingness to fight on the orders of Jehovah is tempered by the fact that, so far as we know, their history records no such command since Biblical times and their theology does not ap-

---

1. Kretchet v. United States, 284 F.2d 561 (9th Cir., 1960); Mayfield v. United States, 220 F.2d 729 (5th Cir., 1955); Moon v. United States, 220 F.2d 730 (5th Cir., 1955); United States v. Lauing, 221 F.2d 425 (7th Cir., 1955); Shepherd v. United States, 220 F.2d 855 (9th Cir., 1955); Bouziden v. United States, 251 F.2d 728 (10th Cir., 1958).

2. *Accord,* United States, ex rel. Greenwood v. Resor, 439 F.2d 1249 (4th Cir., 1971); United States v. Davila, 429 F.2d 481 (5th Cir., 1970); United States v. James, 417 F.2d 826 (4th Cir., 1969).

pear to contemplate one in the future. And although the Jehovah's Witnesses may fight in the Armageddon, we are not able to stretch our imagination to the point of believing that the yardstick of the Congress includes within its measure such spiritual wars between the powers of good and evil where the Jehovah's Witnesses, if they participate, will do so without carnal weapons.

We believe that Congress had in mind real shooting wars when it referred to participation in war in any form—actual military conflicts between nations of the earth in our time—wars with bombs and bullets, tanks, planes and rockets." *Id.* at 390–391, 75 S.Ct. at 406.

Thus the underlying rationale of *Sicurella* was that it was unrealistic to equate a willingness to fight in a theocratic war without carnal arms [3] to a willingness "to participat[e] in war in any form." 50 App. U.S.C. § 456(j). In contrast, Dr. Rosenfeld has stated that he would bear carnal arms if this country were being invaded by a foreign power. Such participation would certainly be in an "actual military conflict[s] between nations of the earth in our time." *Id.* at 391, 75 S.Ct. at 406.

The focus in *Sicurella* is upon those acts which the applicant would perform, and not upon the whereabouts of those persons he would defend. The geographical limits of self-defense were not discussed. The implication is that defense of religious brethren is conceptually different from either self-defense or defense of family, home, and community. Furthermore, even if *Sicurella* could be read to support the contention that one may be entitled to conscientious objector status despite a willingness to act in defense of a group which he is affiliated with, the petitioner has not shown that he would bear arms in defense of any such group.

Finally, the petitioner's statement to the effect that he would bear arms individually if this country were invaded by a foreign aggressor runs afoul of the Supreme Court's decision in Gillette v. United States, *supra.* In *Gillette,* both petitioners specifically objected to the war in Vietnam. Yet the petitioner Gillette ". . . stated his willingness to participate *in a war of national defense* or a war sponsored by the United Nations as a peace-keeping measure . . ." *Id.* 401 U.S. at 439, 91 S.Ct. at 831, 28 L.Ed.2d 168. [Emphasis added.]

Since "objection to a particular war" necessarily includes "[a] virtually limitless variety of beliefs," [4] *Id.* at 455 91 S.Ct. at 839, the Court felt that ". . . real dangers . . . might arise if an exemption were made available that in its nature could not be administered fairly and uniformly over the run of relevant fact situations." *Id.* at 460, 91 S.Ct. at 841. Therefore, the Court concluded that an objector to a particular war does not qualify under the relevant statute for a conscientious objector exemption.

In this case, the petitioner would fight in a defensive war waged on American soil. This is almost the exact situation contemplated in *Gillette.* Furthermore, it makes no difference in this Court's mind whether his participation would be on an individual or group basis. History is replete with actions of persons, acting individually, who have waged war. The test is whether an in-

---

3. In all of the cases cited in footnote 1, *supra,* the applicants were willing to use carnal weapons in a theocratic war. Nevertheless, the courts granted conscientious objector exemptions to each one on the grounds that these cases could not be meaningfully distinguished from *Sicurella.* Thus the *Sicurella* case, as interpreted by these courts, stands for the proposition that if an applicant will fight in a theocratic war only, he is entitled to

an exemption. This line of interpretation has, of course, no bearing on the instant case because the petitioner would fight in a secular war.

4. Included under the varied beliefs which can form an "objection to a particular war" is a desire to only fight in a defensive war in a certain place. *See,* Gillette v. United States, *supra,* at 455, n. 211, 91 S.Ct. 828.

dividual is "opposed to participation in war in any form," 50 App.U.S.C. § 456 (j), and not whether he is opposed to fighting in a group.

Consequently, for the foregoing reasons, this Court holds that the Navy had a basis in fact and in law to deny the petitioner's application for a conscientious objector status. Therefore, the respondents' substitute motion to dismiss petitioner's writ of habeas corpus is allowed. So ordered.