**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald Alan BUSH, Defendant-Appellant.**

**No. 72–1013.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1974.

Decided Jan. 7, 1975.

George C. Pontikes, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman, Theodore T. Scudder, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge and FAIRCHILD, CUMMINGS, PELL, STEVENS, SPRECHER and TONE, Circuit Judges.

SWYGERT, Chief Judge.

We consider, for the third time, the case of Donald Alan Bush. United States v. Bush, 476 F.2d 1094 (7th Cir. 1973); United States v. Bush, 499 F.2d 815 (7th Cir. 1974). Bush was convicted for willfully failing to submit himself for induction under the Selective Service Act of 1967, 50 U.S.C.App. § 462. He appeals his conviction on the ground that he was improperly denied a conscientious objector classification. We find merit in this contention, and therefore reverse his conviction.

The defendant registered with the Selective Service in Cincinnati, Ohio in 1964. At the time he was an engineering student at Purdue University. Bush was classified II-S, and he held this student deferment for fourteen months, until December of 1965 when he withdrew from the University. On January 4, 1966, he requested an SSS Form 150 in order to apply for classification as a conscientious objector. Bush returned the completed Form 150 on January 11, 1966. On that same day the local board rejected his application for C-O status and classified Bush I-A. The board gave no reasons for its decision, and Bush did not seek timely review of this classification.

Subsequently, on June 29, 1966, Bush notified his local board that he had enrolled at Ohio State University. On August 8, 1967 the board again reclassified Bush I-A and notified him of his rights to consult an appeal agent, seek a personal appearance, and take an appeal. This time he exercised all of these rights, pressing his claim for a student deferment. The local board, after hearing Bush at a personal appearance, again classified him I-A. The appeal board af-

firmed the I-A classification on April 11, 1968. On April 29, 1968 Bush was informed that a new form had been received from Ohio State University and that he would therefore be considered for a II-S deferment at the May board meeting. On May 2, 1968 Bush wrote his board indicating he intended to appeal his I-A classification on the ground that he was a conscientious objector, but later the same day he again wrote his board to say that his primary appeal at that point in time was his student deferment and that his C-O appeal should therefore be "deferred" to a later date. In June of 1968 Bush was granted a student deferment.

Shortly before his graduation, in December of 1968, Bush was again reclassified I-A. On December 2, 1968 he responded by notifying the board that he might require an additional quarter to graduate and that he therefore would require an extension of his II-S deferment. He also indicated that he might appeal a I-A classification on hardship grounds in the event he did graduate in December. On December 14, 1968 Bush notified the board that because of "some very good luck and hard work" he would graduate from Ohio State on that day. He also indicated that his possible hardship appeal hinged on facts which would not be known until January of 1969, and that while he could not, therefore, assert hardship as a basis for appeal until January, he did desire to "open an appeal on the basis of my beliefs (As explained in a C.O. form on record with your office since 1965) . . . ." He concluded by stating that "this is an appeal for classification into the C.O. Class."[1]

In furtherance of his desire to appeal his I-A classification on the basis of his beliefs, Bush requested an appearance before his local board. After an exchange of correspondence the board scheduled an interview for February 25, 1969 in Cincinnati, Ohio. Bush was in Detroit, Michigan at this time and notified the board that it would be impossible for him to personally attend the scheduled meeting in Cincinnati. He sent a six page outline of his beliefs for consideration by the board in lieu of his appearance. At its meeting on February 25, 1969 the board reclassified Bush I-A. No reasons were given for this decision. Bush was notified of his rights of appeal and he did appeal. On September 15, 1969, the appeal board affirmed the I-A classification. No reasons were given for the appeal board's action. On June 29, 1970 Bush received a rescheduled induction order and on August 13, 1970 he reported to the Chicago induction station. When his name was called, Bush refused induction.

The defendant contends that his beliefs, as described by his Form 150 filed in 1966 and the six page outline sent to the board in February of 1969, present a *prima facie* case of conscientious objector status under section 6(j) of the Military Service Act of 1967, 50 U.S.C.App. § 456(j). He further contends that in light of this *prima facie* showing the local and appeal boards could not lawfully reject his 1969 C-O claim without stating reasons for their decisions in the matter. Our reading of the relevant cases supports this contention and we therefore reverse Bush's conviction.

We believe this case is controlled by our decisions in United States v. Lemmens, 430 F.2d 619 (7th Cir. 1970), and United States ex rel. Hemes v. McNulty, 432 F.2d 1182 (7th Cir. 1970). In the *Lemmens* case we adopted the "*prima facie*" rule first clearly articulated by the Ninth Circuit in United States v. Haughton, 413 F.2d 736, 739, 742 (9th Cir. 1969).[2] We stated the rule as follows:

> We are persuaded that where the validity of a classification rejecting a claim as conscientious objector is in issue, and where the registrant described a belief which on its face fulfilled the legal requirements, the

---

1. Although Bush did in fact initiate an appeal on the basis of hardship, this appeal was withdrawn on April 18, 1969.

2. *See also* Clay v. United States, 403 U.S. 698, 703–705, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971), and cases cited therein.

board did not state its reasons for rejection, and the court can not otherwise determine with any degree of assurance that the decision really made by the board properly supported the rejection and had a basis in fact, the court should hold the classification invalid. (Footnote omitted.) 430 F.2d at 624.

Under *Lemmens*, we must undertake a two-step analysis. We must first decide whether the beliefs stated by Bush, taken on their face and without regard to the question of the sincerity with which they are held, qualify under section 6(j) of the Selective Service Act of 1967 as the basis for a conscientious objector classification. If we find that the beliefs stated by Bush meet these statutory requirements, we must further decide whether the record allows us to determine, *with any degree of assurance*, the actual basis for the board's decision, *i.e.,* "the decision really made." If the basis for the decision is apparent on the record, we simply proceed to analyze that decision as if the board had stated its reasons.

## I.

▪▪▪▪ The initial question is whether Bush's original SSS Form 150 and his subsequent six page memorandum describe a belief or beliefs which qualify under section 6(j).[3] That section provides:

(j) Nothing contained in this title . . . shall be construed to require

any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term "religious training and belief" does not include essentially political, sociological, or philosophical views, or a merely personal moral code. . . .

The key element under this section is the concept of "religious training and belief," and the main thrust of the Government's argument to us is that Bush's beliefs fall within the "essentially philosophical" and "merely personal moral code" exceptions set out in the statute. The contention does not withstand analysis.

On his original Form 150 filed with his local board on January 11, 1966, Bush signed "statement B" which read, "I am, by my religious training and belief, conscientiously opposed to participation in war in any form and I am further conscientiously opposed to participation in noncombatant training and service in the Armed Forces. I, therefore, claim exception from both combatant and noncombatant training and service in the Armed Forces." In the same form, Bush indicated that he did believe in a Supreme Being. He further described his beliefs at that time by stating:

I believe in the basic Kantian theories (described elsewhere). It is not my belief in a supreme being which

**3.** The government urges that other materials in the file are relevant to the determination of whether Bush has stated a *prima facie* claim. In effect, it urges that since Bush carries a burden to support his C-O claim he must show sincerity as an element of his *prima facie* statement. We reject this contention. Sincerity is a question of fact as to which reasonable minds may well differ. One of the primary reasons for the *Lemmens* rule is to insure that such issues are first considered by local draft boards, and that federal courts know when rejection of a C-O claim by a local board rests on such a consideration rather than on an evaluation of the beliefs themselves. To inject any element of sincerity into the *Lemmens prima facie* test would defeat this fundamental purpose.

Nor is this inconsistent with our previous opinion in Bresette v. Knutson, 443 F.2d 179 (7th Cir. 1971). In that case the issue was not the sufficiency of a *prima facie* statement of conscientious objection to war in the *Lemmens* situation, but rather the sufficiency of such a statement for purposes of reopening a registrant's classification under Selective Service regulations. 32 C.F.R. § 1625.2. Moreover, in *Bresette* the registrant failed to state any *beliefs* whatsoever, relying instead on a rather emotional, but nevertheless bald assertion of "conscientious objection to the tyranny of your system and the unjust deaths that it enacts." 443 F.2d at 180. *Bresette.* is therefore clearly distinguishable.

motivates me to conscientious objection.

. . . . .

I came to believe in the Kantian theories by living for 19 years—many things contributing to this. I believed in what are the Kantian theories long before I found out that that set of beliefs is the Kantian theory.

. . . . .

I try to make my every action consistant [sic] with my beliefs—I do not (as much as possible—I keep trying to improve on this) lie, cheat, steal, infringe on others' rights. My life is lived on finding truth and living it.

. . . . .

I shall try to explain what I believe in here in outline form:

I. I believe in categorical imperatives—There are ultimate truths that are formed not because one is inclined to them but by their intrinsic truthfulness, *i.e.*, killing is wrong.

(These explanations are very weak because to explain these things would take several hundred pages)

II. Things should be done from duty things—right things: Categorical imperatives

III. Each man's actions show what he believes in

IV. I must live by the truth (right)

. . . . .

Imminent human imperative:

No man is God, but each must draw a line as to what he will and will not do. In the use of force I think and believe I would draw mine (I have never been confronted with the situation) in the following way: If a murder [sic] were to attempt to kill someone close to me I would attempt to stop him (I would not kill him).

Almost three full years after Bush filed his initial application for C-O classification he submitted to his local board a six page memorandum which restated and revised his beliefs relative to formalized religion as that term is commonly understood, and to his personal convictions concerning war. On the first page of this document Bush set out the following outline of his beliefs:

I. God

I do not believe in God, I am an atheist. I hold no belief in a super natural [sic] being, nor do I believe in a heaven or hell or in any of the religious, theological teachings of the bible.

II. Man

I believe that man stands at the pinnacle of the hierarchy of living things. There is no superior being to man. I do not believe in life forms from other worlds (men from outerspace). In all of the universe we the inhabitants of this planet are the highest form of life.

III. Truth

That which is correct, real, in accordance with actual existence. Just as there are physical truths which we call laws of science, so there are moral and ethical truths. These truths are invariable, they are constant through all time, they do not change to suit situations.

IV. Knowledge

Because man has powers of the intellect it is possible for him to know truths. Truths do not grow on trees, they must be sought out, learned. Everything that exists and or happens has a relation to a truth.

V. Honor

Man should live according to the moral and ethical and physical truths of the universe. Only in living according to the truths which a man knows can he obtain personal honor.

VI. Human Inadequacy

Man himself, is not a God; he is not a super natural [sic] being. Man can not know all truths, he can not hold all knowledge, nor can he at

every moment live according to the truths which he knows.

Bush went on to explain the major points of this outline in greater detail in the ensuing pages. Relevant to our discussion are the following passages:

I do not believe in life after death which leads me into a conclusion that whatever I do now with my life is all that there is of meaning to me. Consequently I try to make all of my actions purposeful ones. . . . I believe that the present life I am leading is the only one that there will ever be for me and that what I do with it, however I live this particular life of mine will be the measure of my personal worth.

.     .     .     .     .

All potential for both good and evil lie therefore in man. The final justification of a man's life comes in two ways; firstly, to extent that he lives up to his capabilities as a man (every gifted artist should be striving to paint his masterpiece); secondly, to the extent that he can trimpuh over evil (do good) when all of the conditions of his life would dictate that he do evil.

.     .     .     .     .

I do feel I am my own judge. What does a man judge himself on? I believe there is only one basis for judgment—personal honor—the extent to which a man lives in accordance with his beliefs (those things he knows to be truths). For instance you often hear people giving their "word," that they will do such and such a thing when in fact they have no real plan to do the thing. When I give my word that I will do something, then only death can stop me from doing it and indeed I give my word most frequently to myself, not to other people. . . . [T]he only thing I really fear is dieing [sic] without honor. This does not mean that I must die with a sword in my hand but rather than I die upholding things which I believe

in. In the final analysis, whatever I do must be in accordance with what I believe for I sit in judgment over myself and to live life without honor is the greatest crime I could commit and it would be a crime against myself.

At the end of his memorandum Bush offered the following summary specifically devoted to his opposition to war:

Opposition to War

I.   Life is sacred—no man has the right to take another man's life.

II.  Killing is wrong—a moral, ethical truth.

III. War is mass killing.

IV.  It is not enough just to say or believe that war and killing are wrong, you have to live, act in accordance with the knowledge that it is wrong.

V.   Service in the military is in direct support of things which participate in war—and thereby killing.

VI.  I can not in my conscience support the military or its actions by serving in it.

As a consequence, I appeal for a classification into the conscientious objector class so that I may fulfill my obligation to my country in accordance with my beliefs.

These beliefs, while unorthodox in relation to traditional, institutional concepts of "religious training and belief," nevertheless fall well within the confines of the statutory definition of these concepts as recently interpreted by the Supreme Court and our own court. In Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), Justice Black, speaking for a plurality of the Court, set forth the following analysis of the concept of "religious belief":

What is necessary under *Seeger* for a registrant's conscientious objection to all war to be "religious" within the meaning of § 6(j) is that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong and

that these beliefs be held with the strength of traditional religious convictions. . . . If an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual "a place parallel to that filled by . . . God" in traditionally religious persons. Because his beliefs function as a religion in his life, such an individual is as much entitled to a "religious" conscientious objector exemption under § 6(j) as is someone who derives his conscientious opposition to war from traditional religious convictions. 398 U.S. at 339–340, 90 S.Ct. at 1796.

In United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) referred to by Justice Black in the above passage, the Court had held that:

The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition. 380 U.S. at 176, 85 S.Ct. at 859.

While both of these passages had specific reference to the pre-1967 requirement that an individual's belief be "in a relation to a Supreme Being," 62 Stat. 612, the Court's analyses of the beliefs professed by Seeger and Welsh indicate that in both cases the quoted passages were intended to be given the broadest possible application, not only with respect to the "Supreme Being" requirement, but with respect to the "philosophical" and "personal moral code" exceptions as well. Thus, the Court in *Seeger* held that a stated "belief in and devotion to goodness and virtue for their own sakes and a religious faith in a purely ethical creed," 380 U.S. at 166, 85 S.Ct. at 854, qualified under section 6(j) even though the petitioner in that case "cited such personages as Plato, Aristotle and Spinoza for support of his ethical belief

in intellectual and moral integrity 'without belief in God, except in the remotest sense.' " *Id.* Similarly in *Welsh*, Justice Black held that the petitioner there had met the requirements of section 6(j) even though his "conscientious objection to war was undeniably based in part on his perception of world politics." 398 U.S. at 342, 90 S.Ct. at 1797. Justice Black continued:

Welsh stated that he "believe[d] the taking of life—anyone's life—to be morally wrong." App. 44. In his original conscientious objector application he wrote the following:

"I believe that human life is valuable in and of itself; in its living; therefore I will not injure or kill another human being. This belief (and the corresponding 'duty' to abstain from violence toward another person) is not 'superior to those arising from any human relation.' On the contrary: *it is essential to every human relation.* I cannot, therefore, conscientiously comply with the Government's insistence that I assume duties which I feel are immoral and totally repugnant." App. 10. [Original emphasis.]

Welsh elaborated his beliefs in later communications with Selective Service officials. On the basis of these beliefs and the conclusion of the Court of Appeals that he held them "with the strength of more traditional religious convictions," 404 F.2d [1078], at 1081, we think Welsh was clearly entitled to a conscientious objector exemption. Section 6(j) requires no more. That section exempts from military service all those whose consciences, spurred by deeply held moral, ethical, or religious beliefs, would give them no rest or peace if they allowed themselves to become a part of an instrument of war. 398 U.S. at 343–344, 90 S.Ct. at 1798.

It is clear beyond any doubt that the beliefs expressed in Bush's Form 150 and in his subsequent memorandum are of a type that *prima facie* occupy in his life "a place parallel to that filled by the

God of those admittedly qualifying for the exception." *Seeger, supra.* Moreover, these documents clearly show the kind of belief which, if sincerely held, "would give [Bush] no rest or peace if [he] allowed [himself] to become a part of an instrument of war." *Welsh, supra.* Certainly Bush's statement of beliefs cannot be fairly distinguished from the beliefs described in this court's opinion in United States ex rel. Hemes v. McNulty, *supra,* where the petitioner referred to his own beliefs as "my personal moral code," and described his concept of "God" as "man's ability to know love and enter into love relationships." 432 F.2d at 1185.

Finally we note that Bush's statement of beliefs indicates very clearly that his opposition is to war "in any form."

We therefore hold that Bush has stated a *prima facie* case of conscientious objection to war as contemplated by section 6(j) of the Selective Service Act of 1967.

## II.

■ Having held that Bush has stated a *prima facie* case of conscientious objection to war we now must determine whether the record in this case clearly indicates that the decisions of the local board and the appeal board were based on some specific ground having a demonstrated basis in fact and a supportable basis in law. The elements of a claim for C-O status are set out in the Supreme Court's *per curiam* opinion in Clay v. United States, 403 U.S. 698, 700, 91 S.Ct. 2068, 2070, 29 L.Ed.2d 810 (1971):

> In order to qualify for classification as a conscientious objector, a registrant must satisfy three basic tests. He must show that he is conscientiously opposed to war in any form. Gillette v. United States, 401 U.S. 437, [91 S.Ct. 828, 28 L.Ed.2d 168]. He must show that this opposition is based upon religious training and belief, as the term has been construed in our decisions. United States v. Seeger, 380 U.S. 163, [85 S.Ct. 850, 13 L.Ed.2d 733]; Welsh v. United States, 398 U.S.

333, [90 S.Ct. 1792, 26 L.Ed.2d 308]. And he must show that ·this objection is sincere. Witmer v. United States, 348 U.S. 375, [75 S.Ct. 392, 99 L.Ed. 428].

Because we have already eliminated the questions of "religious training and belief" and opposition to war "in any form," our inquiry is limited to whether or not Bush's stated beliefs were sincerely held. However it is not enough for us merely to find a "basis in fact" for a finding of insincerity. In order to affirm this conviction, and thereby affirm the denial of Bush's C-O claim, we would also have to determine *with assurance* that the local board and the appeal board based their actual decisions on a finding of insincerity and not on an evaluation of the substance of his stated beliefs. *Lemmens, supra.*

■ The Government urges five factual bases apparent on the face of the record upon which the local board and appeal board could have determined that Bush was insincere: 1) his participation in a mandatory R.O.T.C. program at Purdue University in 1964, almost two years prior to his initial C-O claim, 2) an alleged suicide attempt, 3) his employment by Chrysler Corporation, which is a manufacturer of military vehicles and equipment, 4) his failure to reassert his original C-O claim at every available point instead of relying on student deferments, and 5) his "juggling of priorities" among his deferment claims. An examination of the record reveals, however, that while it is *possible* that the local and appeal boards could have concluded that one or more of these facts created an inference of insincerity, there is no way of determining *with assurance* that ·they did so or that this was the basis for their ultimate rejection of Bush's claim. We are therefore bound under *Lemmens* to reverse this conviction.

The judgment of conviction is reversed and the cause is remanded with directions to dismiss the indictment.